In re Application of Hagen Truck Lines, Inc.
Hagen Truck Lines, Inc., appellee, v. Robert Y. Ross, doing business as Ross Transfer, et al., appellants, Impleaded with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America et al., appellees.

119 N. W. 2d 76

Filed January 11, 1963. No. 35281.

Jack Devoe and James E. Ryan, for appellants.

Nelson, Harding & Acklie, for appellee Hagen Truck Lines, Inc.

David D. Weinberg and Max A. Powell, for appellees International Brotherhood of Teamsters etc., et al.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

CARTER, J.

This is an appeal from an order of the Nebraska State Railway Commission authorizing Hagen Truck Lines, Inc., to engage in operations as a contract carrier by motor vehicle to transport meat, meat products and by-products, dairy products, articles distributed by meat packing houses, and such commodities as are used by meat packers in the conduct of their business, except liquid commodities in bulk in tank vehicles, moving in mechanically refrigerated equipment from and to packing plants in Omaha, Fremont, and Scottsbluff, to all points in Nebraska, all such lading to originate or terminate at a meat packing, dairy, or poultry plant.

Many objectors entered their appearances in the numerous hearings held by the commission. An appeal

was taken to this court by Ross Transfer, Valentine Motor Lines, West Nebraska Express, Inc., Red Ball Transfer, Watson Bros. Transportation Co., Inc., and O'Neill Transfer, all of whom are common carriers.

On June 6, 1960, the original application was filed which was designated application No. M-11189. On August 8, 1960, Hagen Truck Lines, Inc., filed an application to extend the authority requested in application No. M-11189, which was designated as application No. M-11205. On December 10, 1961, the two applications were consolidated and the entire record on both applications was consolidated and designated as application No. M-11189. The final order of the commission granting application No. M-11189 was made on the basis of both applications and amendments thereto made in the course of the hearings thereon.

The applicant is a newly formed corporation which had no equipment or employees at the time of the final hearing. The president of the corporation, Fred E. Hagen, is the owner of Hagen Truck Lines and has a partnership interest in Dahl Truck Lines, both of which have their main offices in Sioux City, Iowa. Hagen is the general manager of both of the named truck lines and is shown to have many years experience in truck transportation as a common carrier under certificates issued by state and federal agencies. He testified to assets of approximately $400,000 and liabilities approximating $40,000. He has trucks and trailers available, or the means of obtaining them if the application is granted. He is familiar with the rules and regulations of the commission and indicates a willingness and ability to comply with them. The record sustains the finding of the commission that the applicant is fit, willing, and able properly to perform the service of a contract carrier and to render the service required by those requesting it.

The application was supported by the testimony of official representatives of Armour & Company, Swift & Company, Wilson & Company, and Cudahy Packing

Company, each of whom have meat packing plants in Omaha, and by George A. Hormel & Company, who operates a meat packing plant in Fremont, Nebraska. Swift & Company also operates a packing plant in Scottsbluff, Nebraska. The foregoing companies sell and ship meat and meat products to all points in Nebraska. At the time of the hearing each was using its own equipment in delivering its products to customers. The evidence of each is that it desires to discontinue the maintenance of its own equipment and will do so if adequate similar service can be obtained by an authorized contract carrier.

The evidence shows that the distribution of meat and meat products requires a specialized service. These commodities are perishable. A proper handling requires the use of mechanically refrigerated equipment which will maintain a temperature of 33 to 36 degrees. A failure to maintain an even temperature ordinarily results in a discoloration of fresh meat, referred to in the record as a loss of its bloom, which affects its sale. Rails for hanging fresh meat and floor racks to provide proper circulation for other products are essential to proper handling. The carrying of fresh meat and meat products with so-called dry freight is unsatisfactory because of the danger of contamination and odor transfer. Ordinary common carrier service does not and cannot provide this type of service. Truck-to-store service is desired to eliminate the foregoing risks and satisfy the customers of the shippers. Interlined shipments by common carriers expose these commodities to changing temperatures, contamination possibilities, and a harmful appearance of the package or product. The use of common carriers results in high loss and damage claims. Most shipments are less than truck-load quantities and require a peddle service from the packing plant direct to the customer. The packing companies presently operate their own truck routes in peddle service

into the territories they serve for the number of days each week that the volume of business requires.

The meat packers desire to contract with an authorized contract carrier and eliminate the necessity for maintaining this refrigerated equipment and performing this specialized service. They assert that the plants in Omaha could combine their shipments for outstate customers and furnish loads that would adequately compensate a contract carrier and at the same time eliminate the duplicating routes that each now maintains to serve its customers.

Some of the packing companies have had experience with Hagen at Sioux City, Iowa, where he has operated a peddle service in transporting meats and meat products. They testify through their representatives that the service is satisfactory and that they stand ready to enter into contracts with the applicant for similar service from their Nebraska plants if the application is granted. All testify that there is no common carrier in Nebraska who can furnish the type of service they desire to all points in Nebraska.

Practically all meat and meat products from the packing plants in this state are being delivered by the equipment maintained by each. Occasionally shipments are made by common carrier, particularly where the order arrives after the company truck has left and a common carrier has a scheduled service which can make an immediate delivery. Also in a few cases common carriers have been used to deliver large quantities to a distribution center for handling by company trucks. The evidence is that this use of common carriers would be continued if the application is granted, although some would possibly be discontinued.

The meat packers assert that there is a need for this specialized peddle service, that no common carrier can or will perform it, that applicant is a suitable person to perform it, and that they stand ready to contract with the applicant if the requisite authority is granted.

It is the contention of the protestants that the granting of the application would not be in the public interest. They also assert that where there are a large number of competing common carrier operators, regardless of the number of motor vehicle units being operated by them, a grant of an application by a proposed contract carrier would not be consistent with the public interest as declared in section 75-235, R. R. S. 1943.

The evidence of the objecting common carriers is to the effect that the grant of the application will bring about a reduction in their revenue, that they can provide the same service in the areas where they operate, and that the public interest demands a denial of the application. The evidence shows that the objectors generally did not have the equipment to perform the specialized service sought by the meat packers. Some testified that they would provide the equipment, but their conclusions that they could provide truck-to-door peddle service within the requirements and necessities of the meat packers was lacking in evidentiary support. The evidence of the objectors shows that they handled very little meat and meat products in their common carrier operations. The estimates were that such lading consisted of from 1 to 5 percent of the total business of the shippers. The revenue loss, if any, would be of little import. Even if the application were denied, it does not appear that they would gain additional revenue since the meat packers indicate they would retain their present method of distribution of these commodities rather than use common carrier transportation which they have found in the past to be inadequate.

The issuance of a permit by the commission to an applicant seeking authority as a contract carrier is controlled by section 75-235, R. R. S. 1943. In substance, this section provides that a permit will be granted if the applicant is found to be fit, willing, and able to perform the service in accordance with statutory requirements and the rules and regulations of the com-

mission, and that the operation authorized will be consistent with the public interest. In determining the question of public interest, the commission is required to consider the number of competing operators, and not the number of motor vehicle units being operated by competing operators.

The applicant has the burden of establishing affirmatively the conditions precedent to the grant of a permit as a contract carrier and that the proposed operation is consistent with the public interest and the legislative policy set forth in section 75-222, R. R. S. 1943.

A contract carrier by motor vehicle may be generally defined as one who furnishes transportation service to meet the special needs of the individual shipper or shippers. In other words the commission is required to weigh the special needs of shippers desiring the new contract carrier service against the adequacy of the existing common carrier service. The effect on protesting carriers of a grant of the application and the effect on shippers of a denial are factors to be weighed in determining if the grant of the application would be consistent with the public interest. Interstate Commerce Commission v. J-T Transport Co., Inc., 368 U. S. 81, 82 S. Ct. 204, 7 L. Ed. 2d 147.

Even if existing carriers suffered some loss of revenue by the grant of the application, it is not a conclusive factor although it must be considered. Common carriers are not granted a monopoly in the area covered by their certificates. It is only where a loss of revenue to existing carriers occurs which is not in the public interest that such loss of revenue has a controlling effect. Black Hills Stage Lines, Inc. v. Greyhound Corp., *ante* p. 425, 118 N. W. 2d 498.

The Legislature has provided a factor to be considered by the commission which protestants contend is relevant to the situation before us. The statute states in part: "The commission shall, in the determination of the question of public interest of any proposed opera-

tion, take into consideration the number of competing operators, and not the number of motor vehicle units being operated by such competing operators." § 75-235, R. R. S. 1943.

The evidence indicates that there are a large number of common carriers who would be potential competitors of applicant if the application is granted. While many of them have statewide authority, the evidence is that they do not operate in such a manner as to give peddle service in a truck-to-door operation, carrying only the commodities of the proposed shipping contractors. It would seem that the limitation of the commission's consideration to the number of competing carriers and not the number of motor vehicle units being operated by them is for the purpose of permitting the obtaining of equipment for specialized service after the carriage becomes available. The number of units operated by a common carrier has little relevancy in considering a specialized service such as we have here. It is for this reason, we think, that the number of existing units of common carriers becomes unimportant by statutory pronouncement. The number of competing common carriers who are fit, willing, and able to perform the proposed contract carrier service, even if they do not have the equipment available to perform it but are able to provide it, is a primary consideration.

Section 75-235, R. R. S. 1943, provides that the proposed contract carrier service must be consistent with the public interest. The term "consistent with the public interest" is quite different in its meaning than "public convenience and necessity," as used in section 75-228, R. R. S. 1943. The former requires only that the proposed contract carrier service does not conflict with the legislative policy of the state in dealing with transportation by motor carriers. The latter requires a consideration of the present service rendered in the territory, the need of additional service, and the facilities which the applicant can provide. It will be observed

that to be "consistent with the public interest" is much less exacting in proof of an application for a permit than in the case of establishing "public convenience and necessity." Consistent with public interest simply means that it is not contrary to the public policy of the state, as set out in the Motor Carrier Act.

A contract carrier does not hold its service out to the general public as does a common carrier. The contract carrier serves only certain shippers under specific contracts for its special needs. The shipper is permitted much more control over the operations of the contract carrier than in the case of the common carrier. In the instant case the contract carrier is to perform the service now being handled by the transportation equipment of the shippers supporting the application. There will be little diversion of traffic from existing carriers and little possibility of added revenue to existing carriers if the application is denied.

The evidence in this case supports the following findings: The applicant is fit, willing, and able to perform the proposed service. There is a need for the service, which is specialized, on the part of the supporting shippers. The interested shippers are willing to contract with the applicant for the specialized service if the application is granted. Existing carriers will not be seriously affected by a grant of the application, nor measurably benefited by its denial. A grant of the application would be consistent with the public interest and the legislative policy of the state. Such being true, the commission was acting within its powers in granting the application and its order in so doing is not arbitrary and unreasonable.

AFFIRMED.

SIMMONS, C. J., not participating.