IN RE APPLICATION OF WELLS FARGO ARMORED SERVICE
CORP., OF NEBRASKA, INC., OMAHA, NEBRASKA.
WELLS FARGO ARMORED SERVICE CORP., OF NEBRASKA, INC.,
APPELLEE, V. BANKERS DISPATCH CORPORATION, CHICAGO,
ILLINOIS, APPELLANT.
182 N. W. 2d 648

Filed January 8, 1971.   No. 37518.

W. W. Wallin and Acklie & Peterson, for appellant.

Joseph J. Vinardi, Harold W. Kauffman, and William A. Day, Jr., of Gross, Welch, Vinardi, Kauffman, Schatz & Day, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

WHITE, C. J.

This is an appeal by Bankers Dispatch Corporation, hereinafter referred to as B.D.C., from a Nebraska State Railway Commission order granting a contract carrier permit to Wells Fargo Armored Service.

Samardick of Grand Island-Hastings, Inc., filed an application with the Nebraska State Railway Commission on September 23, 1968, seeking authority to operate in Nebraska instrastate commerce as a contract carrier by motor vehicle, over irregular routes, transporting cash, letters, checks, and other commercial papers, data processing materials, and other documents and records related thereto. B.D.C. filed a protest to the granting of the application.

Subsequent to the filing of the application, Wells Fargo acquired the operating authority of Samardick.

By stipulation of the parties, Wells Fargo was the applicant in the commission proceedings and is the appellee here. The commission granted the contract carrier permit to Wells Fargo and this appeal by B.D.C. followed.

On appeal from the Nebraska State Railway Commission, this court is usually only called upon to decide if the commission acted within the scope of its authority and whether the order in question was reasonable and not arbitrarily made. Poulson v. Hargleroad Van & Storage Co., 183 Neb. 201, 159 N. W. 2d 302 (1968). It is this latter issue that is involved here.

The commission consistently treated Wells Fargo's application as one for a contract carrier permit. The application, as filed, sought such a permit. However, the commission need not be bound by the applicant's own definition of the proposed service. If it is in fact an application in the nature of a common carrier, the commission should treat it as such. Midwest Mail Service, Inc. v. Bankers Dispatch Corp., 174 Neb. 809, 119 N. W. 2d 692 (1963).

A contract carrier has been generally defined by this court as "one who furnishes transportation service to meet the special needs of the individual shipper or shippers. In other words the commission is required to weigh the special needs of shippers desiring the new contract carrier service against the adequacy of the existing common carrier service." Hagen Truck Lines, Inc. v. Ross, 174 Neb. 646, 119 N. W. 2d 76 (1963). If the service can be performed as well by common carrier, a need for a contract carrier has not been established.

A contract carrier permit application is governed by section 75-311, R. S. Supp., 1969: "A permit shall be issued to any qualified applicant therefor, authorizing in whole or in part the operations covered by the application, if it appears after notice and hearing from the application or from any hearing held thereon that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to

conform to the provisions of sections 75-301 to 75-322.01 and the lawful requirements, rules and regulations of the commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest; otherwise, such application shall be denied."

"Consistent with the public interest," as used by the quoted section, means that the proposed contract carrier service does not conflict with the legislative policy of the state in dealing with transportation by motor vehicles. Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp., 183 Neb. 229, 159 N. W. 2d 310 (1968). To be contrasted with this is the heavier burden put upon an applicant for a common carrier certificate. In that case, the applicant must meet the test of "public convenience and necessity," also set out in section 75-311, R. S. Supp., 1969: "A certificate shall be issued to any qualified applicant therefor * * * if it is found * * * that the proposed service * * * is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied."

In determining such public convenience and necessity, the deciding factors are "whether the operation will serve a useful purpose responsive to a public demand or need; whether this purpose can or will be served as well by existing carriers; and whether it can be served by applicant in a specified operation without endangering or impairing the operations of existing carriers contrary to the public interest." Moritz v. Transcontinental Bus Lines, Inc., 153 Neb. 206, 43 N. W. 2d 603 (1950).

The original application in this case stated that only the Omaha National Bank would be served in the operation. Wells Fargo revealed at the hearing that there were at least four more proposed contracting parties. In addition, Wells Fargo proposes to add as many contracts as it can by actively soliciting business. The vice president of Wells Fargo of Nebraska testified that his company intends to make contacts with "all the poten-

tial clients" in order to provide service for them.

Wells Fargo had authority prior to the application in question to transport coin and currency in armored vehicles between all points in Nebraska. By the present application, Wells Fargo hopes to also carry shipments of letters, checks, and data processing material. B.D.C. presently serves all of the various correspondent banks used by Wells Fargo as supporting witnesses. B.D.C. already transports all the requested commodities for these banks, with the exception of coin and currency.

Thus, given Wells Fargo's admitted intention of active solicitation, the only real distinguishing factor between the service now rendered by B.D.C. and that which is to be performed under the contract carrier permit is that Wells Fargo could provide such service on a contract basis. The evidence does not support this as being sufficient to constitute a "service to meet the special needs of the individual shipper or shippers." Hagen Truck Lines, Inc. v. Ross, 174 Neb. 646, 119 N. W. 2d 76 (1963).

The language in Midwest Mail Service, Inc. v Bankers Dispatch Corp., 174 Neb. 809, 119 N. W. 2d 692 (1963) is in point: "The fact that the proposed service will be used by a limited class of persons or businesses is not a controlling factor. Many services rendered by common carriers are limited or specialized, depending upon the nature of the industry being served. It seems clear to us that applicant desires authority to transport the designated articles for the general needs of all shippers. These are factors indicating a common carrier service and not that of a contract carrier. Even though applicant purports to transport only a limited number of articles for a limited number of businesses who alone have occasion to transport them, the evidence indicates that applicant intends to hold itself out to perform transportation service for all shippers of articles named in the permit."

We conclude, therefore, that the proposed service is

that of a common carrier and, if such authority is to be granted, it must be shown that it is required by public convenience and necessity.

As mentioned earlier, one deciding factor in determining public convenience and necessity is whether the proposed service can or will be served as well by existing carriers. Appellee contends that its witnesses showed they supported its application in order to provide competition as to service as well as rates. It is true that some of the witnesses said that service competition was part of the basis for their opinion. However, it was shown that the service which the witnesses were commenting on, i.e., the authority to transport letters, checks, and other commercial papers, data processing material, and other documents and records related thereto, was a service which was already furnished by B.D.C. The singular exception to this was the transportation of coins and currency, which is of such minor significance in this instance that it does not distinguish the two operations. In fact, Wells Fargo's predecessor in interest, Samardick, never transported combined shipments of coin and currency and data processing materials on any regularly scheduled basis, even though it had authorization to do so.

In addition, many of those same witnesses stated they had not even discussed the proposed services with the appellee. Many stated that if the application were granted they would then find out what Wells Fargo might be able to provide that was advantageous to them. Contrary to appellee's contentions, all but one of the witnesses stated that B.D.C.'s services had been satisfactory. There was testimony showing that B.D.C. had been able to adjust its existing schedules and implement new ones in order to satisfactorily accommodate various banks' needs.

Inasmuch as B.D.C. can provide the service in question, we believe that the granting of such a permit in this instance would endanger or impair the operations of

the existing common carrier, B.D.C., contrary to the public interest. B.D.C. derives over one-fourth of its revenue from the service it provides for banks which supported Wells Fargo's application. In addition, it must be remembered that Wells Fargo has no intention of limiting itself to the specified customers. This will not mean "limited competition of a nonfatal nature," as was found by the Railway Commission. On the contrary, all of the bank business now enjoyed by the common carrier will be subject to applicant's competition. Wells Fargo's diversion of B.D.C.'s business would deprive B.D.C. of revenue that is needed in order to give satisfactory service to its present customers, the shipping public.

Fair and reasonable competition is not undesirable. However, the competition here cannot be termed either fair or reasonable. It is competition that at best would merely permit one carrier to gain a competitive advantage over another in performing what are substantially the same services. In this instance, such competition is not in the public interest. We believe that the granting of such a permit does not promote adequate, economical, and efficient motor carrier service such as is required by the legislative policy set out in section 75-301, R. R. S. 1943. On the contrary, it would only lead to unfair or destructive competitive practices such as are expressly condemned by that section.

We conclude, therefore, that the granting of the contract carrier permit was without support of the evidence. A need for a more specialized service than that now provided by B.D.C. was not shown. The granting of the permit was shown to have an effect on B.D.C. which would be contrary to the public interest. It was not shown that a denial of the application would have an adverse effect upon the shippers. As a result we reverse the order of the Railway Commission as unreasonable, arbitrary, and of no force and effect.

REVERSED.

McCOWN, BOSLAUGH, and SMITH, JJ., dissenting.

The majority opinion states: "We conclude, therefore, that the proposed service is that of a common carrier and, if such authority is to be granted, it must be shown that it is required by public convenience and necessity." That conclusion is contrary to the specific factual finding of the railway commission, which was supported by evidence. The conclusion is also directly opposite in result from that reached by this court more than two years ago. The former case was Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp., 183 Neb. 229, 159 N. W. 2d 310, decided by this court on June 7, 1968. In that case we affirmed an order of the railway commission authorizing "operations as a *contract carrier* by motor vehicle to transport cash, letters, checks and other commercial papers, data processing materials, and other documents and records thereto related." The parties were the predecessor of the present applicant and the identical protestant involved here. The case involved the same type of commodities, the same type of service, the same type of certificate, and the same economic and policy issues. The applicant here is presently operating as a contract carrier of the commodities involved under the regular route certificate granted in that case.

The only real distinction between the prior case and this one is that the applicant here seeks to extend its contract carrier authority from a specific regular route authority to an irregular route authority extending over the entire state.

The majority opinion here apparently takes the unique position that because the applicant stated that it desired to contract for its services with five banks rather than one and to solicit other banks where it was possible to furnish necessary services, the operations are somehow converted from a contract carrier type of operation to a common carrier type of operation.

The evidence is almost undisputed that the needs

of banks for transportation services for data processing materials are specialized within a rigid time and place framework. The record is abundantly clear that neither the rules of the railway commission nor any law or previous decision of this court limit the holder of a contract carrier permit to contracting for the authorized carriage with a single specific shipper or even a series of named shippers. Not even the protestant takes that position.

The majority here has substituted its own definition of a "contract carrier" for that prescribed by statute, by previous opinions of this court, and by the regulatory body charged with the responsibility of carrying out legislative policy.

In the original Samardick case in 1968, this court said: "The term 'consistent with the public interest' is quite different in its meaning than the term 'public convenience and necessity.' The former means only that the proposed contract carrier service does not conflict with the legislative policy of the state in dealing with transportation by motor carriers, while the latter requires a consideration of the present service being rendered in the territory, the need of additional service, and the facilities which the applicant can provide. Consistent with the public interest simply means that it is not contrary to the public policy of the state as expressed in the Motor Carrier Act."

The evidence here is replete with testimony indicating the requirements of specialized service to meet the needs of the banking industry in connection with prompt and efficient data processing. We refer again to the original Samardick case in 1968. We also said there: "The evidence as to where the public interest lies in the present case is in conflict. The determination of the public interest in such a case is one that is peculiarly for the determination of the commission. If there is evidence to sustain the findings of the commission, this court cannot intervene. It is only where the findings of

the commission are against all the evidence that this court may hold that the commission's findings on the evidence are unreasonable and arbitrary. Where the evidence is in conflict, as here, the weight of the evidence is for the determination of the commission and not for this court."

It is glaringly apparent that the majority opinion here is grounded upon the principle that a single, somewhat specialized, common carrier ought to be protected from all competition. In effect, the majority opinion says that the type of specialized service rendered by that common carrier, at least if it is offered to more than one contract shipper by any other carrier, can only be that of a common carrier and cannot be contract carriage. These are policy issues into which this court ought not to inquire. The entire statutory and regulatory pattern for motor carriers in this state clearly demonstrates that such policy decisions were specifically committed to the railway commission. Whatever expertise and experience it may have is and should be applied to making such policy determinations in the public interest. An attempt by this court to determine how much competition is in the public interest and where the competition ought to be or ought not to be is a clear usurpation of the authority and jurisdiction specifically committed to the railway commission.

The basic principles undergirding the regulation of motor carriers was stated very effectively in Black Hills Stage Lines, Inc. v. Greyhound Corp., 174 Neb. 425, 118 N. W. 2d 498: "The purpose of the Nebraska Motor Carrier Act was regulation for the public interest. Its purpose was not to stifle legitimate competition but to foster it. Its purpose was not to create monopolies in the transportation industry, but to eliminate discrimination, undue preferences or advantages, and unfair or destructive competitive practices. Legitimate competition is a normal attribute of our free enterprise system.

It must be permitted to exist and the law contemplates that it shall."

The extent and level of regulation of motor carriers is a matter of legislative policy. It has been committed to the jurisdiction of the railway commission. When the evidence on policy issues is in conflict, but there is evidence to sustain the findings and orders of the commission, this court cannot and should not act in the role of a superimposed regulatory body. See, Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp., *supra;* Neylon v. Petersen & Petersen, Inc., 181 Neb. 143, 147 N. W. 2d 488.

There was evidence here to sustain the findings and the order of the railway commission. It was within the jurisdiction of the commission to act and the action was neither arbitrary nor unreasonable. Its order should be affirmed.