IN RE APPLICATION OF NORTHLAND TRANSPORTATION, INC. NORTHLAND TRANSPORTATION, INC., APPELLANT, V. HERMAN BROTHERS, INC., ET AL., APPELLEES.
479 N.W.2d 764

Filed February 7, 1992.    No. 89-673.

Marshall D. Becker for appellant.

Jack L. Shultz and Gregory D. Barton, of Heron, Burchette, Ruckert & Rothwell, and James E. Ryan, P.C., for appellees.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

White, J.

Northland Transportation, Inc. (Northland), appeals from a decision of the Public Service Commission denying its application for a contract carrier permit allowing it to transport fertilizer from the facilities of Farmland Industries in Hastings and Beatrice, Nebraska, to Wilcox, Nebraska, and points within a 25-mile radius of Wilcox.

Northland originally applied for a common carrier

certificate, but at a hearing held on March 9, 1989, amended its application to a request for contract carrier authority only. Protests to the application were filed by Wheeler Transport Service, Inc.; Central Transportation Company, Inc. (Central); Herman Brothers, Inc.; Wynne Transport Service, Inc.; and Schroetlin Tank Line, Inc. After Northland amended its application, Wheeler withdrew its protest. Of the remaining protestors, only Central and Herman Brothers appeared at the hearing.

## FACTUAL BACKGROUND

The Wilcox Cooperative Association (the Association) is a farmers' cooperative in the business of buying and selling fertilizer products and grain for use by its approximately 300 members. The Association purchases its fertilizer from Farmland Industries, which has plants in both Hastings and Beatrice. The Hastings plant is located approximately 60 miles from Wilcox and supplies 95 percent of the Association's fertilizer needs.

Beginning in 1981, Central was responsible for hauling dry fertilizer, liquid fertilizer, and anhydrous ammonia from Farmland's plants to the Association's six storage facilities located in and around the Wilcox area. Central is a licensed common carrier authorized to haul each of these products. However, Central did not use its own equipment to haul the Association's fertilizer. Instead, Central leased trailers and the tractor trucks used to pull those trailers from Northland. In turn, Northland procured most of the tractors used for the Association account through a series of annual leases with Lester Johnson, an independent owner-operator who lived in Wilcox. Thus, Central did not dispatch trucks for the Association account. When the Association needed something hauled, it called either Northland or Johnson himself. Central's participation was limited to performing the billing functions and procuring the required insurance, though there is evidence that Northland actually acquired its own insurance. For providing these services, Central retained 7 percent of the revenue earned from the Association account.

Northland is authorized as a contract and common carrier of

bulk commodities by both the Interstate Commerce Commission and the Public Service Commission. However, neither Northland nor Johnson is authorized to haul anhydrous ammonia within the State of Nebraska. In the spring of 1988, a commission inspector notified Northland that Johnson could not legally haul anhydrous ammonia in Northland trailers based only on authority derived from Central through the leases. Northland's vice president and chief executive officer testified that prior to this notification, he was unaware that Northland's dealings with Johnson and the Association violated the commission's rules. Northland filed the application at issue in an effort to resolve this problem.

In support of its application, Northland introduced its balance sheet, which shows assets of $469,807, liabilities of $153,921, and total retained earnings of $285,886 for the year ending January 31, 1988. Northland also produced evidence that the amount of anhydrous ammonia hauled for the Association nearly tripled between 1985 and 1988 and was projected to increase again in 1989. The Association's general manager stated that he expected the Association's fertilizer business to keep growing due to its addition of a satellite facility south of Wilcox, a change of ownership at a competitor's plant, and a decrease in the number of acres set aside under a government farm program.

Northland also pointed to certain services specifically tailored to the Association's needs which common carriers cannot provide. The most fundamental of these services is Northland's willingness to allocate equipment exclusively to the Wilcox account during the peak fertilizer application period each spring. Northland developed the practice of loading three trailers in Hastings at the end of each day and then returning them to Wilcox for the night in order to get a headstart each morning. The Association's general manager testified that it is "essential" to his business that this practice continue. Because the Wilcox plant consists of six relatively small tanks rather than one large tank, an individual tank supplying a farmer can run out of ammonia in a very short time. Stationing Northland's trailers in Wilcox enables Johnson to deliver a load to that tank within 30 minutes, whereas if the Association had

to call Hastings for a common carrier the delivery might take half a day. Unlike Northland, which preloads its equipment and holds it overnight in Wilcox free of charge, common carriers will not do so without charging a demurrage fee.

Northland also noted that the limited capacity of the Association's tanks can result in the presence of too much fertilizer. A farmer may order a load of fertilizer for delivery on a particular morning only to encounter bad weather or an equipment breakdown that day. In such situations, Johnson and his drivers either divert the delivery to another tank, split the delivery among several tanks, or simply leave the loaded trailer sitting in Wilcox until a tank which can accommodate the load is available. The ability to respond in this manner results from a combination of Johnson's thorough knowledge of the current capacity of each tank and Northland's willingness to dedicate its trailers exclusively to the Wilcox account. There is evidence that if faced with a similar situation, a common carrier would either divert the load to another account or take it back to Hastings, charging the Association for the wasted trip. Such carriers will not allow their trailers to remain in a given location until an open tank is available, and their drivers may lack the detailed knowledge possessed by Johnson necessary to divert the load to another tank.

Finally, Northland presented evidence that it possesses the equipment necessary to service the Association's account. The Association requires pressure trailers for anhydrous ammonia, pneumatic trailers for dry fertilizer, and stainless steel trailers for liquid fertilizer. Northland possesses all three types of trailers, including 13 pneumatic units for use on the Association account. Northland's vice president and chief executive officer noted that the use of pneumatic equipment is becoming more prevalent in Wilcox because of a decrease in rail service there.

Central's general manager testified that his company is authorized to provide all the Association's trucking needs and that his company is willing and able to do so. He stated that the use of leased drivers is common in the industry and that Central is willing to continue the lease agreement with Johnson. He also stated that Central owns or operates 50 to 60 tractor units and 150 to 160 trailers, and has equipment suitable for the shipment

of fertilizer stationed throughout the Wilcox area. He testified that his company could dedicate such equipment to the Wilcox plant "on a dispatch basis" and "might" even allocate equipment there if the situation demanded it. He admitted that Central does not operate any pneumatic equipment, though he stated it would purchase or lease such equipment if the need arose. He concluded that Central opposed Northland's application to prevent the loss to Northland of business normally handled by Central.

The Midwest regional manager for Herman Brothers echoed the points made by Central. He noted that Herman Brothers holds the necessary authority for the Association account and is desirous of gaining that business. Herman Brothers possesses trailers suitable for hauling all three types of fertilizer used by the Association, and that equipment was not operating at full capacity at the time of the hearing. It has four ammonia "bottles" located in Holdrege, Nebraska, which is only 8 miles from Wilcox, as well as additional ammonia bottles and pneumatic tanks located in Grand Island, Nebraska. Herman Brothers' Midwest regional manager indicated that the placement of ammonia bottles in Holdrege enabled the company to "pick up some additional business out there." He also expressed a willingness to lease equipment operators during the peak season and stated that Northland's evidence revealed no service which his company could not also provide.

Obviously, the advantages to the Association of Johnson's presence in Wilcox is one of the key aspects of this case. Indeed, Johnson actually performed many functions normally the responsibility of the Association, such as keeping a running inventory of the area tanks and taking it upon himself to get them filled when necessary without waiting for a farmer to call. There is evidence that Johnson would prefer to continue leasing his services to Northland rather than some other common carrier. The peak season for applying fertilizer occurs during March and April of each year, when 85 to 90 percent of all anhydrous ammonia transported during the year is hauled. Northland's annual leases guaranteed Johnson work during the remainder of the year, and he expressed a reluctance to lease his services to another common carrier for fear he would lose this

additional income.

## ASSIGNMENTS OF ERROR

Northland's 10 assignments of error combine to argue that the commission erred in (1) failing to find that the authority sought would provide a unique service designed to meet the distinct needs of the supporting shipper and (2) finding that the evidence does not show that granting the application sought would be consistent with the public interest.

## STANDARD OF REVIEW

In an appeal from a decision of the Public Service Commission, the Supreme Court examines the record to determine whether the commission acted within the scope of its authority and whether the evidence shows that the order in question is unreasonable or arbitrary. *In re Application of Koch Service*, 228 Neb. 631, 423 N.W.2d 767 (1988). This court does not act as an appellate public service commission and will sustain the action of the commission if there is evidence in the record to support it. *In re Application of Silvey Refrig. Carr.*, 226 Neb. 668, 414 N.W.2d 248 (1987).

## CONTRACT CARRIAGE IN NEBRASKA

A contract carrier is defined as one, other than a common carrier, which furnishes transportation service to meet the special needs of an individual shipper or shippers. *Wells Fargo Armored Service Corp. v. Bankers Dispatch Corp.*, 188 Neb. 584, 198 N.W.2d 195 (1972) (*Wells Fargo II*), citing Neb. Rev. Stat. § 75-302 (Reissue 1972). To qualify for a contract carrier permit, an applicant must show (1) that it is fit, willing, and able to properly perform the service of a contract carrier and to conform to the applicable statutes and lawful requirements, rules, and regulations of the commission and (2) that the proposed operation will be consistent with the public interest by providing services designed to meet the distinct needs of each customer or class of customers. Neb. Rev. Stat. § 75-311 (Reissue 1986).

In *Hagen Truck Lines, Inc. v. Ross*, 174 Neb. 646, 119 N.W.2d 76 (1963), this court discussed the relationship between contract and common carriers. In that case Hagen Truck Lines

applied for authority as a contract carrier to haul meat and dairy products for various packing plants in Nebraska. The packing plants desired the service because the applicant could provide refrigerated equipment and truck-to-store service not offered by common carriers. Several common carriers protested, asserting that they could provide the desired service and that granting the application would reduce their profits, in derogation of the public interest. The commission granted the application, and the protestants appealed to this court.

In affirming the commission's decision, the court held that the potential loss of revenue by common carriers resulting from issuance of a contract carrier permit does not necessarily render the permit inconsistent with the public interest. Though that is a relevant factor, the court indicated that if the desirability of satisfying the shipper's distinct needs outweighs the detrimental effect on existing carriers, granting the authority sought is consistent with the public interest.

Thus, the commission, in determining whether to issue a permit for contract carrier authority, must weigh the distinct needs of the shipper or shippers against the effect on and adequacy of existing common carrier service. *In re Application of Koch Service, supra*; *Wells Fargo II, supra*; *Wells Fargo Armored Service Corp. v. Bankers Dispatch Corp.*, 186 Neb. 261, 182 N.W.2d 648 (1971) (*Wells Fargo I*); *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp.*, 183 Neb. 229, 159 N.W.2d 310 (1968); *Hagen Truck Lines, Inc., supra*. Though evidence that common carriers can satisfy the *distinct* needs of a shipper as well as a contract carrier renders issuance of a permit inconsistent with the public interest, mere proof that the services of common carriers are *adequate* to fulfill the shipper's needs is not conclusive when the applicant's service is better designed to fit the shipper's special requirements. *Wells Fargo II, supra*. Moreover, the "consistent with the public interest" standard for obtaining a contract carrier permit is much less exacting than the "public convenience and necessity" standard for issuance of a common carrier certificate. The former means only that the proposed service does not conflict with the legislative policy of the state regarding transportation by motor vehicles. *Wells Fargo I, supra*; *Samardick of Grand*

*Island-Hastings, Inc., supra*; *Hagen Truck Lines, Inc., supra.*

In *Wells Fargo II, supra*, this court set forth the proper procedure for determining whether a grant of contract carrier authority is consistent with the public interest. We held that the initial burden is on the applicant to produce competent evidence that the proposed service is specialized and needed. Protesting common carriers may then present evidence that they are willing and able to perform the same specialized service. Upon production of such evidence by the protestants, the burden is again on the applicant to establish that it is better equipped and qualified to meet the special needs of the shipper or shippers than are the protestants. *Id.*, citing *Samardick of Grand Island-Hastings, Inc., supra.*

## THE COMMISSION'S ORDER

In its order denying Northland's application, the commission stated, "[T]he evidence falls short of the required showing that a grant of additional authority would be consistent with the public interest. Applicant showed no reason why the owner-operator . . . could not lease his equipment to one of the common carriers already in the field . . . ."

Later in its order, the commission also stated, "It is not in the public interest to siphon away choice customers from common carriers and institute contract carriage. The transportation system the Legislature has charged this Commission to foster and protect is based upon sound common carriers." Because these findings reflect a misapplication of the aforementioned substantive and procedural principles, we reverse.

The original version of § 75-311 was enacted in 1937, see Neb. Rev. Stat. § 75-235 (Reissue 1943), and the current version is found at § 75-311 (Reissue 1989). The statute has been patterned after its counterpart in the Motor Carrier Act, passed by Congress in 1935. See Motor Carrier Act, ch. 498, § 209(b), 49 Stat. 543, 553 (1935) (current version at 49 U.S.C. § 10923 (1988)). For this reason, and because it is the policy of the Legislature to cooperate with the federal authorities in administering and enforcing the Motor Carrier Act, this court looks to decisions interpreting the federal act for guidance in construing our own statute. See, *Preisendorf Transp., Inc. v.*

*Herman Bros., Inc.*, 169 Neb. 693, 100 N.W.2d 865 (1960); Neb. Rev. Stat. § 75-301(6) (Reissue 1986).

In *I. C. C. v. J-T Transport Co.*, 368 U.S. 81, 82 S. Ct. 204, 7 L. Ed. 2d 147 (1961), J-T Transport Company and Elvin L. Reddish applied separately for authority to haul certain goods as contract carriers. The Interstate Commerce Commission denied both applications. In denying J-T Transport's application, the ICC stated that " '[t]here is, in effect, a presumption that the services of existing carriers will be adversely affected by a loss of "potential" traffic, even if they may not have handled it before.' " *Id*. at 368 U.S. at 84, quoting *J-T Transport Co., Inc., Extension—Columbus, Ohio*, 79 M.C.C. 695 (1959). The ICC concluded that J-T Transport failed to establish the inability of existing carriers to meet the shipper's special needs and therefore failed to rebut the presumption. The ICC relied on similar reasoning in rejecting Reddish's application.

The U.S. Supreme Court held that the ICC erred in both cases. The Court interpreted the Motor Carrier Act as requiring a weighing of the distinct need of a shipper for contract carriage against the effect on and adequacy of existing services. The purpose of the act, the Court determined, is not to protect the status quo of existing carriers, but to establish a system whereby new contract carriage is allowed if the distinct needs of the shipper indicate its desirability. Finally, the Court delineated the proper procedure for determining whether to grant a permit for contract carrier authority. The Court stated that the applicant must first demonstrate that the proposed service is specialized and tailored to a distinct need, at which point the protestants may present evidence as to their willingness and ability to meet that distinct need. If that is done, the Court noted, the burden shifts to the applicant to show it is better equipped to fulfill the shipper's needs.

Having reviewed the substantive and procedural rules governing applications for contract carrier permits, the Court held that the ICC erred in denying the authority sought. The Court reasoned that the ICC's presumption of an adverse effect on existing carriers and its assignment to the applicants of the burden of proving the inadequacy of existing services

improperly tipped the scale in favor of the protestants.

It is evident that the substantive and procedural standards enunciated in *J-T Transport Co.* closely resemble those governing applications for contract carrier authority under § 75-311. Here, as in that case, the commission improperly tipped the scales in favor of the protestants in denying Northland's application.

The commission concluded that Northland failed to show any reason why Johnson could not lease his equipment to one of the common carriers already in the field. It is not the applicant's burden to establish the inability of existing common carriers to provide the same specialized service it proposes to provide. As noted earlier, Northland's initial burden was merely to show that the proposed services are specialized and tailored to the Association's distinct needs. See *Wells Fargo II, supra.* Northland satisfied this burden with evidence of its willingness to dedicate equipment to the Association account, to station trailers in Wilcox overnight without charging a demurrage fee, and to provide flexibility in the delivery of fertilizer to the first available tank, as well as with evidence regarding its relationship with Johnson and its possession of the necessary equipment. Once such evidence was adduced, the burden was then on the protestants to show they could provide the same specialized service. *Id.* We conclude, therefore, that the commission erred in assigning to Northland the burden of explaining why the protestants could not provide the same services.

Another basis relied upon by the commission was its finding that it is not in the public interest to "siphon away" choice customers from common carriers and that the transportation system is "based upon sound common carriers." Though the commission did not expressly use the word "presumption," as did the ICC in *J-T Transport Co.*, this finding reflects at least a preference for common carriers over contract carriage, inconsistent with Nebraska law. It is well settled that in deciding whether to grant a contract carrier permit, the commission is to weigh the special needs of the shipper desiring the contract carriage against the adequacy of and effect on existing common carrier service. *In re Application of Koch Service*, 228 Neb. 631,

423 N.W.2d 767 (1988); *Wells Fargo II, supra*; *Samardick of Grand Island-Hastings, Inc. v. B.D.C. Corp.*, 183 Neb. 229, 159 N.W.2d 310 (1968); *Hagen Truck Lines, Inc. v. Ross*, 174 Neb. 646, 119 N.W.2d 76 (1963). The fact that existing common carriers will lose revenue if the permit is granted is not necessarily dispositive. The proposed service may still be consistent with the public interest if it is needed and the applicant can meet the shipper's distinct needs better than can the protesting common carriers. We conclude that the commission's implicit suggestion that it is *always* inconsistent with the public interest to grant a contract carrier permit when existing common carriers can adequately serve the shipper improperly tipped the scales against Northland in this case.

When the commission decides a case using an improper legal standard, it acts arbitrarily and therefore commits reversible error. See *Dilts Trucking, Inc. v. Peake, Inc.*, 197 Neb. 459, 249 N.W.2d 732 (1977). The decision is therefore reversed and the cause remanded with directions to the commission to issue the contract carrier permit to Northland.

REVERSED AND REMANDED WITH DIRECTIONS.