# AMERICAN COURIER CORPORATION v. LOOMIS ARMORED CAR, INC., d.b.a. SWEENEY-LOOMIS ARMORED CAR SERVICE, AND ANOTHER.

200 N. W. 2d 175.

July 28, 1972—No. 43181.

*Lindquist & Vennum* and *William E. Fox,* for appellant.

*Briggs & Morgan, M. J. Galvin, Jr., Philip L. Bruner, Reaugh, Hart, Allison & Prescott,* and *George H. Hart,* for respondent Loomis.

*Warren Spannaus,* Attorney General, *Curtis Forslund,* Solicitor General, and *Michael L. Schwab,* Special Assistant Attorney General, for respondent commission.

Heard before Knutson, C. J., and Otis, Rogosheske, and Gunn, JJ.

ROGOSHESKE, JUSTICE.

Protestant-appellant, American Courier Corporation, appeals from a judgment of the district court affirming an order of the Public Service Commission which granted to petitioner-respondent, Loomis Armored Car Service, Inc., a contract carrier permit under Minn. St. 1969, § 221.121, subd. 1, to transport in intrastate commerce certain financial institution commodities for 18 named banks and financial computer centers.[1] The appeal to the district court was submitted upon only the record made before the commission. Adhering to the rule limiting the scope of judi-

[1] Minn. St. 1969, § 221.121, subd. 1, provides in part: "Any person desiring to operate hereunder as a permit carrier, except as a livestock carrier, shall file a petition with the commission specifying the kind of permit desired, the name and address of the applicant, and the names and addresses of the officers, if a corporation, and such other information as the commission may require. The commission, after notice to interested parties and a hearing, shall issue the permit upon compliance with all laws and regulations relating thereto, unless it finds that the area to be served has a sufficient number of carriers to fully and adequately meet the needs of such area or that applicant's vehicles do not meet the safety standards set up by the commission or that applicant is not fit and able to conduct the proposed operations * * *."

cial review of factual determinations by the commission, we hold that the critical findings that there is a growing demand for the specialized services offered by the parties and that protestant's services alone do not fully and adequately meet the needs of the area to be served are supported by substantial evidence. Accordingly, we affirm the judgment of the district court.

Loomis is a Washington-based corporation which provides armored-car, courier, guard, and patrol services to financial institutions in several states and Canada. The company became qualified to do business in Minnesota as a foreign corporation on July 15, 1966, with local offices in St. Paul. In 1967, Loomis purchased Sweeney Detective Bureau, Inc., a Minnesota company which provided local courier, guard, detective, and patrol services in St. Paul, Minneapolis, St. Cloud, and Duluth. Prior to this purchase, Sweeney was granted authority to transport intrastate cash letters and DDA materials between four banks located in the St. Cloud area and Twin City banks and computer centers.[2] In July 1967, the commission approved the sale of

---

[2] Cash letters are packages of bank checks and drafts being returned to the drawee bank from banks in which they have been deposited for collection and credit. The Federal Reserve Bank of Minneapolis is the primary central clearing house for such checks and drafts, and each day it receives cash letters from depositor banks and sends processed cash letters to drawee banks.

DDA or Demand Deposit Accounting media consists of the computerized accounting material of a bank's daily transactions. Computerized accounting material consists of magnetic tapes or data processing punch cards upon which are contained a bank's daily accounting entries to checking accounts, savings accounts, account reconciliations, installment and commercial loans, and trust accounts. This data processing material must be transported daily to computer centers, where the data is processed by computer, thus updating a bank's accounts. A printout of the current status of all accounts is produced, which must be returned to the bank before the start of the next business day. Other financial related materials consist of documents and records the banks wish to transport by a courier rather than by other modes of transportation. Microfilm is also utilized to record numerous items processed by banks and must be transported.

Sweeney to Loomis and granted the transfer of Sweeney's intrastate shipping authority to Loomis. On April 15, 1969, Loomis petitioned the commission to service additional institutions.[3] American Courier protested the petition before the commission.

American Courier also is an interstate company with its headquarters in New York and local offices in Minneapolis. It was the first company to offer intrastate courier service of cash letters in Minnesota. Its original operating authority permitted it to provide cash letter service to 20 banks. At the time American Courier began operating in Minnesota in 1959, bank accounting procedures had not been computerized, and therefore no DDA materials then required transportation. By the date of the hearing in 1969, however, there were approximately 451 out of the state's 725 state and national banks utilizing computerized banking methods in one form or another. Of this number, only about 200 were serviced by American Courier even though it enjoyed a virtual monopoly on such intrastate courier service in Minnesota.[4] The remaining financial institutions used other commercial transportation such as mail, bus, and air, which are for the most part now deemed inadequate.

Following hearing before the Public Service Commission, which commenced May 6, 1969, and extended over 4½ days, the commission issued its final order on December 24, 1969, granting Loomis authority to service 18 of the 21 financial institutions and computer centers named in its petition. The commission specifically found, pursuant to § 221.121, subd. 1, that Loomis

---

[3] The background to this final petition is lengthy. It is sufficient to note that Loomis, by its predecessor, first applied for authority to service additional institutions in 1966. After the district court set aside a favorable order as unsupported by the record and subsequently enjoined the commission from granting ex parte orders to Loomis to service various additional banks, the parties stipulated to a de novo hearing before the commission based on Loomis' petition filed in April 1969. The appeal to district court and to this court followed that hearing.

[4] From our understanding of the record, at the time of hearing in 1969, Loomis provided courier service for 8 financial institutions.

was fit and able to conduct the proposed services; that its vehicles met the safety standards established by the commission; and, most importantly, that "the area to be served [Minnesota] does not have a sufficient number of carriers to fully and adequately meet the needs of the area and that all financial institutions desiring this specialized transportation service have not been able to secure such service." Pursuant to Minn. St. 1969, § 216.24, American Courier appealed to district court, where the commission's findings and conclusions were upheld.

On appeal to this court, the dispositive issue is whether there is sufficient evidence in the record to support the commission's finding that the needs of the area to be served were not fully and adequately met by the existing carrier, namely, protestant American Courier Corporation.[5] Before the commission, the petitioner generally has the burden of going forward with the evidence and establishing affirmatively the statutory conditions precedent to the granting of the permit. However, it is the protestant's burden to show existing couriers adequately and fully meet the needs of the shippers in the area to be served. The capabilities of the protestant to meet the shippers' needs are matters peculiarly within its knowledge. See, Mitchell Transport, Inc. v. Railroad & Warehouse Comm. 272 Minn. 121, 127, 129, 137 N. W. 2d 561, 565 (1965); I. C. C. v. J-T Transport Co. Inc. 368 U. S. 81, 90, 82 S. Ct. 204, 210, 7 L. ed. 2d 147, 155 (1961).[6] By com-

[5] Minn. St. 15.0425; Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 180 N. W. 2d 175 (1970).

[6] See, also, Application of Forde L. Johnson Oil Co. 84 Idaho 288, 372 P. 2d 135 (1962). There, the relevant statutory provision, Idaho Code Ann. § 61-802 (1959), did not contain the exact provision that a carrier permit be denied if the existing carriers were found sufficient. The Idaho Supreme Court stated in a proceeding similar to that involved here that the protestant had no burden before the Idaho Public Utilities Commission. Nevertheless, that court cautioned that a protestant is the only reasonable source of information regarding its ability to meet the needs of the shippers, which factor necessarily is considered under the language of § 61-802.

prehensive proof, American Courier established itself before the commission as a respectable, well-managed, and profitable company which was ready, willing, and able to meet not only the existing but the growing demands for courier service. Nevertheless, in light of evidence submitted by Loomis and the shippers named in the petition, protestant failed to persuade the commission that it could fully and adequately meet the needs of the area's shippers. Based on the entire record, the commission could conclude that American Courier failed to meet the needs of the area's shippers in route flexibility, in its ability to provide combined courier and armored-car service, and, in response to requests for service, in quoting rates which caused shippers to forego the service and to use other less adequate transportation.[7]

Cash letters are in fact uncollected money or credited money in transit, and any loss of time in collecting deposits causes a bank to lose the interest, or "float," on such deposits. Therefore, exacting scheduling requirements are necessary for handling, and daily courier service is becoming recognized as the only adequate means to meet the pickup and delivery demands. Similar scheduling requirements exist for DDA materials so these commodities can be processed and returned to the various banks before the opening of the next business day. While route scheduling must be exact, the need for a varied and flexible route structure is acute. Cash letter delivery to and from the Federal Reserve Bank is circular in that the courier upon delivery of a cash letter to the Federal Reserve Bank picks up a cash letter to be returned in one stop each day. Routing for DDA materials requires the courier to transport the materials from the bank to the computer center in the afternoon or evening and return it to the bank the following morning. In view of the number of banks and financial institutions which use and may likely need courier service in the future, the route structure must be infinite-

---

[7] The record, although less dramatically, also supports a conclusion that American Courier was on occasion dilatory in responding to bank requests for courier service.

ly varied to provide combined or separate transportation of cash letters and DDA materials. The record supports a conclusion that protestant was unable to provide the route flexibility deemed essential and that another courier would alleviate, at least in part, scheduling inadequacies of a single courier.

Pickup and delivery of cash letters, DDA materials, and other related materials after bank closing time creates special security and reliability problems for the bank. The carrier must be provided a key to the bank or special outside depositories. The value of the materials (predicated on the man hours it would take to reconstruct transactions reflected in the materials) and the risk of allowing entry to the bank or depositories compel banks to select a special service courier which can thoroughly monitor safekeeping of the commodities, including precautions to guard against theft or duplication of bank or depository keys and providing special containers for safe carriage of the commodities. Other forms of public transportation are considered inadequate because of the increased risk that the commodities might be sent to the wrong destination or be damaged, lost, delayed, or stolen in transit. The record indicates that Loomis is considered by some shippers the courier which presents the least risk because it provides local armored-car service along with its intrastate courier service while American Courier does not. Thus, with Loomis as the courier, the banks would need to provide only one carrier with keys or access to handle all their local and intrastate shipping requirements. This arrangement is considered more secure and easier to administer than contracting with several carriers for the necessary services.

When American Courier's service has been solicited by shippers, it has quoted rates which have caused some shippers to provide their own transportation or to use other public transportation. We agree with protestant that a statuory rate proceeding should not be injected into proceedings for an intrastate carrier permit. A rate advantage offered by the petitioner which promotes the shipper's adoption of the service to meet its needs is,

however, relevant under § 221.121, subd. 1, in determining whether the present protesting carrier adequately meets the needs of the area. Conversely, the probable effect of denying the petition and forcing shippers to use transportation deemed inadequate is also relevant. Placing these considerations before the commission falls short of a rate proceeding. See, I. C. C. v. J-T Transport Co. Inc. *supra;* Alexandria, Barcroft & Washington Transit Co. v. Washington Metropolitan Area Transit Comm. 323 F. 2d 777, 781 (4 Cir. 1963); and see, In re Application of Hagen Truck Lines, Inc. 174 Neb. 646, 652, 119 N. W. 2d 76, 81 (1963).

Finally, protestant contends the commission committed an error of law in concluding that the transportation policy of this state does not insulate existing carriers against competition. This statement is in accord with our discussion in Mitchell Transport, Inc. v. Railroad & Warehouse Comm. 272 Minn. 121, 127, 137 N. W. 2d 561, 565, and was not error.

The commission's conclusion that American Courier did not adequately and fully meet the needs of the shippers and its order granting Loomis further intrastate shipping authority are the product of administrative experience and the commission's appreciation of the complexities created by the sudden and phenomenal expansion of demand for specialized courier service of cash letter and DDA materials. As the United States Supreme Court said in Securities & Exchange Comm. v. Chenery Corp. 332 U. S. 194, 209, 67 S. Ct. 1575, 1583, 91 L. ed. 1995, 2006 (1947), the commission's conclusions reflect "the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process." The burden on appeal is upon protestant-appellant to establish that the commission's findings and conclusions resolving conflicts of evidence are not supported by the entire record submitted. Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 180 N. W. 2d 175 (1970). In light of the judicial deference which should be accorded the commission,

Quinn Distributing Co. Inc. v. Quast Transfer, Inc. 288 Minn. 442, 449, 181 N. W. 2d 696, 700 (1970), the district court correctly concluded that protestant did not carry its burden of establishing that the agency findings are not supported by substantial evidence.

Affirmed.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.