**Appeal of SIGNAL DELIVERY SERVICE, INC. from a Final Order of the Minnesota Public Service Commission Denying Petition for Contract Carrier Permit.**

**SIGNAL DELIVERY SERVICE, INC. and Minnesota Public Service Commission, Respondents,**

**v.**

**BRYNWOOD TRANSFER COMPANY, et al., Appellants.**

**No. 49651.**

Supreme Court of Minnesota.

Jan. 18, 1980.

---

Finley & Hoekstra and James F. Finley, New Brighton, for appellants.

Briggs & Morgan, M. J. Galvin, Jr., and John B. Van De North, Jr., St. Paul, Thompson, Hine & Flory and John Andrew Kundtz, Cleveland, Ohio, for Signal Delivery Service, Inc.

Warren Spannaus, Atty. Gen., and Erica Jacobson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Service Commission.

WAHL, Justice.

Appellant motor carriers opposed the petition of respondent Signal Delivery Service, Inc. to the Minnesota Public Service Commission for an intrastate contract carrier permit pursuant to Minn.Stat. § 221.121, subd. 1 (1978). They appeal from an order of the Ramsey County District Court, which reversed the order of the Commission denying the permit. The issue before us is whether the findings and conclusions of the Public Service Commission are supported by substantial evidence. We find that they are not and affirm the order of the district court.

On October 13, 1975, respondent Signal Delivery Services, Inc. filed a petition with the Minnesota Public Service Commission for a contract carrier permit authorizing it to serve Whirlpool Corporation in transporting parts, equipment, machines, electrical and gas appliances and completed goods, manufactured by Whirlpool in the cities of St. Paul and Cottage Grove, Minnesota, to and from all Minnesota points. Various motor carriers filed protests to the Signal application, alleging there was no need for an additional intrastate permit to be issued.

A hearing was held, after which the hearing examiner recommended to the Commission that a contract carrier permit be issued authorizing Signal to provide outbound service for Whirlpool, but not inbound service. Signal filed exceptions to the examiner's report. The Public Service Commission heard the case on the record, briefs and oral argument on August 25, 1976. On October 13, 1976, the Commission issued an order denying Signal's petition for a permit. Signal appealed the Commission's decision to the district court of Ramsey County. On July 28, 1978, the district court issued an order reversing the decision of the Commission. Motions for amended findings or a new trial were filed by the Commission and the protesting carriers. After the argument by the parties, the district court issued a subsequent order on December 5, 1978, again reversing the Commission's decision. This appeal by the protesting carriers followed.

Judicial review of Public Service Commission decisions is governed by Minn. Stat. § 15.0425 (1978), the Minnesota Administrative Procedure Act. *Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co.*, 288 Minn. 294, 180 N.W.2d 175 (1970). That section provides:

In any proceedings for judicial review by any court of decisions of any agency as defined in section 15.0411, subdivision 2 (including those agencies excluded from the definition of agency in section 15.-0411, subdivision 2) the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

The substantial evidence test is applicable to commission decisions when it is acting in a quasi-judicial manner; that is, when the commission hears the view of opposing sides presented in the form of written and oral testimony, examines the record and makes findings of fact. *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 251 N.W.2d 350, 356 (1977). In reviewing decisions of administrative agencies, the Supreme Court is not bound by the district court's decision. This court may conduct an independent examination of the administrative agency's record and decision and arrive at its own conclusions as to the propriety of that determination. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn.1977). This court must therefore decide whether the Public Service Commission's factual findings are supported by substantial evidence, whether its decision is lawful and reasonable and unaffected by errors of law, and whether its conclusions are arbitrary and capricious. *Id.* at 827.

The record below reveals the following facts:

Signal Delivery Service, Inc., with headquarters in Hinsdale, Illinois, is the largest contract motor carrier in the United States. It serves three accounts, Whirlpool, Sears, and Jones & Laughlin Steel Corporation. In 1975, Signal generated before-tax profits of over 6.7 million dollars, and the company's balance sheet reflected a net worth of approximately 15.5 million dollars on December 31, 1975. Signal has contract carrier authority to operate in various states, interstate and intrastate. However, it holds no authority to transport commodities intrastate in Minnesota, and it is this authority that is sought by Signal in this action. It is authorized to serve the Whirlpool facility in St. Paul under its interstate authority.

Whirlpool is a leading manufacturer of major home appliances. It maintains many manufacturing facilities in numerous cities around the country, including St. Paul and Cottage Grove, Minnesota. Signal serves Whirlpool at all of these facilities in intra- and interstate commerce through terminals located at or near most of the manufacturing plants. Signal maintains a central dispatch center in St. Joseph, Michigan to coordinate all of the drivers servicing the various Whirlpool facilities.

In states other than Minnesota, Whirlpool and Signal have an integrated telephone system which allows dispatchers and office personnel to talk directly with the receiving, purchasing or traffic departments. This system is also available to Signal on a standby basis so that workers in each of Signal's facilities can talk to each other. In addition, Signal planned by late 1976 to have computer-to-computer communications between Signal's facilities and Whirlpool's. A trailer log is kept by Signal's workers which allows Whirlpool to determine what materials are sitting on Signal's trailers, how many are available, and where they are located. Signal's employees also regularly attend Whirlpool's daily production scheduling meetings. If a determination is made at this meeting that essential parts are needed for the next day's production, this information is relayed to Signal's central dispatcher, who expedites the movement of these parts to the Whirlpool facility which needs them.

Signal proposes to perform these kinds of services for Whirlpool in Minnesota if the authority which it requests is granted. Signal would maintain facilities approximately halfway between Whirlpool's St. Paul and Cottage Grove plants. It would dedicate approximately 72 trailers and 18 tractors for use in Whirlpool's intrastate traffic and would conduct the operation using trailer logs and a communications system similar to that used in other states. It was esti-

mated at the time of the hearing that Signal would handle 25 to 30 percent of Whirlpool's intrastate traffic. Whirlpool intends to continue to rely on existing common carrier service for much of its transportation needs in Minnesota.

Whirlpool set out several advantages to having Signal provide its transportation service in Minnesota. Whirlpool requires its carrier to have the ability to be a component of Whirlpool's communications network, to dedicate equipment solely to Whirlpool's needs, and to respond to those needs before all others. Signal has been providing these services to Whirlpool in other states for almost 25 years. Furthermore, Whirlpool expects Signal's service would produce a one-time inventory reduction of approximately $500,000, an annual inventory expense reduction of $76,000, and reduced warehousing costs of approximately $28,000 per year. In addition, Whirlpool believes the availability of Signal's services in Minnesota would alleviate congestion problems at its St. Paul plant and make Whirlpool's transportation system cheaper and more efficient.

Appellants are motor carriers who have either local cartage or regular or irregular route authority under which they could serve virtually all of the locations in Minnesota where Whirlpool has vendors or manufacturing facilities. All have adequate equipment and personnel to carry the quantity of Minnesota intrastate freight required by Whirlpool. Most, however, must hold themselves out, on call, to the general shipping public. Only one appellant, Witte Transportation Company, has contract carrier authority.

Appellants Lofgren, Heaton and Dittrich, at the time of the hearing, carried freight to the Whirlpool plant in St. Paul from Rush City, Clearwater, and New Ulm, respectively. Trucking, Inc. has leased trailers to Whirlpool, and Merchants Cartage has hauled goods for Whirlpool which required specialized hauling equipment. Otherwise, none of the appellants has hauled goods for Whirlpool in recent years, although they have actively solicited Whirl-

pool's business. Whirlpool lets its local cartage business out on competitive bids, and the successful bidder performs the work under a multi-year contract. At the time of the hearing, this contract was held by an authorized local cartage carrier who is not a party to this action. Whirlpool has no specific complaints about the service presently being rendered by authorized carriers in Minnesota. Whirlpool did not attempt to determine whether any motor carrier with Minnesota operating authority can meet its needs. However, Whirlpool believes that no other authorized carrier can provide the complete package of services that Signal can provide.

Signal's petition for contract carrier authority was filed pursuant to Minn.Stat. § 221.121, subd. 1 (1978), which provides that the permit may be granted by the Public Service Commission:

> * * * if it finds that petitioner is fit and able to conduct the proposed operations, that petitioner's vehicles meet the safety standards established by the department, that the area to be served has a need for the transportation services requested in the petition, and that existing permit and certificated carriers in the area to be served have failed to demonstrate that they offer sufficient transportation services to meet fully and adequately such needs * * *.

It is undisputed that Signal is fit and able to serve Whirlpool's needs, that its vehicles meet appropriate safety standards, and that Whirlpool has a need for the services which Signal could provide. The third statutory criterion is the contested criterion in this case. The hearing examiner found that the protesting carriers had failed to demonstrate that they could adequately fulfill Whirlpool's highly specialized needs, since none of them showed they could integrate fully into Whirlpool's communications system. The Commission found that the protesting carriers had made a sufficient showing that they could provide the types of specialized service desired by Whirlpool, so that the burden shifted to Signal to show that they could not provide the service,

which burden Signal did not meet. The district court held that the protesting carriers had failed to demonstrate that they could meet Whirlpool's needs, that there was no evidence that granting the authority to Signal will adversely affect the protesting carriers, and that the Commission's order improperly insulated existing carriers against new competition.

Before the Commission, the petitioner has the burden of going forward with the evidence and establishing affirmatively the statutory conditions precedent to the granting of the permit. However, it is the protestant's burden to show existing carriers adequately and fully meet the needs of the shippers to be served. *American Courier Corp. v. Loomis Armored Car, Inc.*, 294 Minn. 207, 200 N.W.2d 175 (1972).

Many of the existing carriers had, or could acquire, adequate personnel and equipment to serve Whirlpool. Several of them had authority to provide services between all of the Minnesota cities to be served. However, only one appellant, Witte Transportation Company, has contract carriage authority, which Signal seeks and Whirlpool desires its carrier to have. There was no evidence in the record to show whether Witte would be able or willing to keep trailer logs, attend production scheduling meetings, or integrate into Whirlpool's telephone and computer communications system.

A major part of Whirlpool's specialized needs is that its transportation be integrated with its elaborate communications system. Trucking, Inc. indicated it would not be willing to install a computer system if it was too expensive. Dittrich Trucking testified it presently has no computer equipment. Hyman Freightways, Inc. has a computer. However, there is no other evidence in the record that any of the other protesting carriers have computer accessibility or could integrate their communications systems into Whirlpool's. No single existing carrier can adequately fulfill Whirlpool's specialized needs at the present time.

Not only is the order of the Commission unsupported by substantial evidence, under our standard of review, the trial court rightly discerned that the order also has the effect of improperly protecting existing carriers contrary to the purpose of Minn.Stat. § 221.121, subd. 1. In *Mitchell Transport, Inc. v. Railroad & Warehouse Commission,* 272 Minn. 121, 128–29, 137 N.W.2d 561, 566 (1965), we noted that contract carriers should not be prevented from satisfying the changing transportation requirements of basic industries, especially where the distinct needs of the shipper may be better served by the new service than by the existing carriers. *See also Quinn Distributing Co. v. Quast Transfer, Inc.,* 288 Minn. 442, 450, 181 N.W.2d 696, 701 (1970). We also stated in *Mitchell* that Minn.Stat. § 221.121, subd. 1, was enacted to protect new under-financed permit applicants, not to insulate existing carriers from further competition. This policy was reaffirmed by the court in *American Courier Corp. v. Loomis Armored Car, Inc., supra.* There is no question that Signal is a large, experienced, and well-financed company which is well able to provide Whirlpool with the services it requires. Furthermore, since very little of Whirlpool's business is provided by appellants, issuing a permit to Signal could not substantially impair their present operations. Whirlpool indicated that much of its transportation needs would be met by carriers other than Signal.

While we are reluctant to overturn a decision of the Public Service Commission, we must conclude the district court was correct in its decision that the protesting carriers failed to show they could meet Whirlpool's needs, that there was no evidence that granting the authority to Signal would adversely affect the protesting carriers, and that the Commission's order improperly insulated existing carriers against new competition.

Affirmed.