**BRINKS, INC., Relator,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent.**

**No. C3–84–423.**

Court of Appeals of Minnesota.

Sept. 18, 1984.

Robert D. Gisvold, Mackall, Crounse & Moore, Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., State of Minn., Craig R. Anderson, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and LESLIE and CRIPPEN, JJ.

## OPINION

LESLIE, Judge.

Brinks, Inc. (Brinks) appeals from the Minnesota Public Utilities Commission's (Commission's) final order granting Rochester Armored Car Company's application for irregular route common carrier authority and from the Commission's order denying Brinks' petition for reconsideration. Brinks claims that the Commission did not have jurisdiction to decide this matter, that the Commission's decision to grant Rochester Armored Car's petition was not supported by substantial evidence, and that the Commission acted arbitrarily and capriciously by not giving proper deference to the hearing examiner's findings. We affirm.

## FACTS

Rochester Armored Car Company (RAC) is an armored motor transport company engaged in the transportation of currency

and other valuables. It began business in Rochester, Minnesota in 1965 as a common carrier serving local banks, retail accounts and other financial institutions. Since then it has expanded its operation into eight other states. In 1970, RAC started an armored car service in Moorhead, Minnesota to serve banks and other financial institutions in the Fargo-Moorhead and Grand Forks areas. It operates a vault and an office in Moorhead. RAC has employees and vehicles stationed in Moorhead, Rochester and Grand Forks, North Dakota.

RAC holds a courier service carrier (CSC) permit from the Minnesota Public Utilities Commission. Its CSC permit authorizes it to transport packages and articles less than 100 pounds in weight in vehicles with a manufacturer's nominal rating capacity not exceeding one ton. Minn.Stat. § 221.011, subd. 25 (1982). These vehicles are termed A-type vehicles.

RAC has used larger B-type vehicles with unrestricted weight classifications to transport valuables in interstate commerce but it is limited under its CSC permit to A-type vehicles for deliveries within Minnesota. When RAC makes both interstate and intrastate deliveries it must use one A-type and one B-type vehicle. RAC now petitions for an irregular route common carrier (IRCC) permit to use larger B-type vehicles.

### RAC's contract with the Federal Reserve Board

In 1982 the Federal Reserve Board (the Reserve Board) advertised for bids from armored car carriers for transportation of coin and currency from the Reserve Board's terminal facilities to depository institutions throughout the state. RAC, Brinks, Loomis, and other carriers submitted bids. RAC was the successful bidder to provide transportation services from the Reserve Board's Minneapolis and Moorhead terminals to its customers in northwestern and southeastern Minnesota starting November 1, 1982. The Reserve Board awarded the contract based upon no minimum monthly charge for RAC's services, the availability of a vault in Moorhead, and the lowest bid based upon a per-stop monthly charge. Although the bids submitted by Brinks and Loomis were higher than RAC, the Reserve Board's witness did not characterize the bids as unreasonable or prohibitive. The Reserve Board does employ Brinks and Loomis in other areas of Minnesota.

The Reserve Board does not prohibit carriers from providing service to other customers, nor does it require carriers to use B-type vehicles. It does require delivery on a regular and dependable schedule. Customers of the Reserve Board ultimately pay for the armored car service. Shipments of coin and currency are assessed to each member and nonmember bank, depending on the frequency with which the bank contracts for delivery.

When RAC began service under its contract, it transported coin and currency from Minneapolis using a B-type vehicle followed by a 40 foot trailer to stock its vault in Moorhead. It has made additional trips between Minneapolis and Moorhead using larger B-type vehicles carrying bags of currency which it believes to be on consignment because the bags bear no names of depository institutions. RAC does not consider such movements to be for hire. It also carries currency in bags which are specifically identified for depository institutions in Minnesota. The Reserve Board has no complaint with RAC's service.

### RAC's Petition for an IRCC Permit

On October 22, 1982, upon learning that its use of B-type vehicles might be unauthorized, RAC filed a petition with the Minnesota Department of Transportation requesting an IRCC permit to use B-type vehicles to transport coins and currency for the Reserve Board. The Department of Transportation referred the matter to the Public Utilities Commission, which published notice of RAC's petition. On November 22, 1982, Loomis and Brinks timely filed petitions to intervene and protest.

The matter was referred to the Office of Administrative Hearings. In February 1983 the hearing examiner heard testimo-

ny, and issued his report May 16, 1983. The hearing examiner found that the Reserve Board is currently adequately served in the geographic area by RAC under its CSC authority. The examiner also found that RAC is unfit to provide the requested service because it had used B-type vehicles beyond its CSC permit weight limitations for shipments wholly within Minnesota. The hearing examiner recommended that RAC's petition be denied and that RAC be ordered to cease and desist from illegally transporting coin and currency within Minnesota in excess of its CSC permit authority.

On June 30, 1983, the Public Utilities Commission rejected the hearing examiner's recommendation, and granted RAC's petition for IRCC permit authority on December 23, 1983. The Commission found that though RAC may have transported coin and currency in excess of its CSC permit authority, RAC was fit and able to conduct the proposed operations. The Commission also found RAC had provided sufficient evidence to support the need for IRCC authority to serve the Reserve Board, and the protestants had not met their burden of showing that existing carriers offer services which fully and adequately meet this need.

Brinks filed a petition for reconsideration on January 12, 1984, which was denied by the Commission's order of February 13, 1984. This appeal, in which Loomis did not join, followed.

## ISSUES

1. Did the Commission properly retain jurisdiction to render a final agency decision in this contested case regarding motor carrier operating authority which was submitted to the Commission before July 1, 1983?

2. Is the Commission's decision granting RAC's petition supported by substantial evidence?

3. Did the Commission act arbitrarily and capriciously by deviating from the hearing examiner's findings and rejecting his recommendations?

## ANALYSIS

■ Judicial review of administrative agency decisions is governed by the Administrative Procedures Act, Minn.Stat. §§ 14.-63 to 14.69 (1982). The scope of the court's review of such decisions is limited. Substantial judicial deference must be accorded to the fact finding processes of an administrative agency. *Quinn Distributing Company v. Quast Transfer, Inc.,* 288 Minn. 442, 448, 181 N.W.2d 696, 699 (1970). "[D]ecisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by the courts to the agencies' expertise and their special knowledge in the field of their technical training, education and experience." *Reserve Mining Company v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).

### 1. *The Commission's Jurisdiction*

Before enactment of Minn.Laws 1980, ch. 534, the Public Utilities Commission had jurisdiction over intrastate motor carrier regulatory matters. The Transportation Regulation Board (Board), created by Minn. Laws 1980, ch. 534, came into existence on July 1, 1983 and assumed jurisdiction over such matters. *See* Minn.Laws 1981, ch. 357, § 108 (establishing the effective date of Minn.Laws 1980, ch. 534). Brinks argues the Commission did not have jurisdiction over this case because authority over matters of intrastate motor carrier regulation had been transferred from the Commission to the Board on July 1, 1983. The Commission issued its order on December 23, 1983.

■ The legislation creating the Board did not provide which agency should complete contested transportation cases pending before the Commission on July 1, 1983. Minn.Stat. § 16.125 subd. 1 (1982) authorizes the Commissioner of Administration, with prior approval of the governor, to assign administrative responsibilities among state agencies to maximize governmental efficiency. Pursuant to that authority, the Commissioner of Administra-

tion transferred to the Public Utilities Commission the power to decide contested cases which had been returned from the Office of Administrative Hearings on or before September 1, 1983. This case was returned to the Commission May 16, 1983. The Commission clearly had authority to decide this matter.

### 2. Sufficiency of Evidence Supporting the Commission's Decision

■ A reviewing court may reverse or modify an administrative agency's decision if it finds that the decision is not supported by substantial evidence. Minn.Stat. § 14.-69 (1982). *See Signal Delivery Service, Inc. v. Brynwood Transfer Co.*, 288 N.W.2d 707, 709 (Minn.1980). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" or "more than a scintilla of evidence." *Reserve Mining Co. v. Herbst*, 256 N.W.2d at 825.

■ RAC's petition for IRCC permit authority was filed in accordance with Minn. Stat. § 221.121, subd. 1 (Supp.1983). That statute requires the Board (in this case the Commission) to issue a carrier's permit:

if it finds that petitioner is fit and able to conduct the proposed operations, that petitioner's vehicles meet the safety standards established by the department [of transportation], that the area to be served has a need for the transportation services requested in the petition, and that existing permit and certified carriers in the area to be served have failed to demonstrate that they offer sufficient transportation services to meet fully and adequately those needs * * *."

*Id.* The petitioner has the burden of establishing the statutory conditions precedent to the granting of the permit; however, the protestant must show that existing carriers offer services which adequately and fully meet the needs of the shippers to be served. *Signal Delivery*, 288 N.W.2d at 712. Brinks, here the protestant, complains the grant of RAC's permit was improper because the statutory requirements of § 221.121 subd. 1 were not met. Brinks

claims RAC is not fit to provide the requested service, RAC did not show a need for the service and it established that the existing carriers offer sufficient services.

Brinks asserts RAC is not fit and able as required by § 221.121 subd. 1 because it transported coin and currency in excess of its CSC authority. Minn.Rules 7800.0100, subpart 4 (1983) defines "fit and able" for the purposes of § 221.121 to mean:

the applicant is financially able to conduct the proposed business; that the applicant's equipment is adequate and properly maintained; that the applicant is competent, qualified and has the experience necessary to conduct the proposed business; that the applicant is mentally and physically able to comply with the rules and statutes of the commission.

■ The record indicates that RAC transported coin and currency between Minneapolis and Moorhead in vehicles larger than those authorized for use under CSC authority; however, the Commission found that in light of RAC's experience, its knowledge of the regulations and statutes, and its financial condition, RAC is fit and able within the meaning of Minn.Rules 7800.0100, subpart 4. The Commission noted that the legality of the movements is difficult to determine. RAC moves coin and currency both interstate and intrastate. It also moves consigned coin and currency. RAC does not consider movements of consigned coin and currency to be shipments for hire. The Commission also noted that it will generally deny applications for CSC or IRCC authority after an applicant has been involved in unauthorized operations only when the previous violations evince a continuing and willful disregard for the law. The vice president of RAC testified he was advised by counsel that these movements were legal. He sought IRCC authority from the Commission when he was further advised by different counsel that the movements might be illegal. We conclude the Commission's finding that RAC is fit and able within the meaning of Minn. Rules 7800.0100, subpart 4 is supported by substantial evidence.

Brinks next argues that RAC did not meet its burden of establishing a need for the proposed IRCC service. The Commission found RAC's underbidding of its competitors indicative of the public need for an additional grant of IRCC authority. Such a grant, it said, recognizes the public need for enhanced competition in the area of coin and currency transportation. The Commission cited its recent decision of *Ram Security, Inc.*, Docket No. IRCC 46170/A–82–448 (June 29, 1983) in which it concluded that a need exists for enhanced competition in this area to provide adequate service to the Fed. The Commission stated that, with the exception of the grant of authority to Ram Security, the competitive situation has remained substantially the same since June 1983. The Commission concluded that granting IRCC authority to RAC will enhance competition and improve service to the Reserve Board and the public.

■ Brinks argues that RAC's underbidding of other carriers does not establish a need for the service. We find that the Commission correctly relied upon that factor. In *American Courier Corp. v. Loomis Armored Car, Inc.*, 294 Minn. 207, 200 N.W.2d 175 (1972), Loomis sought intrastate authority to service financial institutions in Minnesota and American Courier protested. The question before the court was whether the other carriers offered adequate service to the shipper. There the court stated:

A rate advantage offered by the petitioner which promotes the shipper's adoption of the service to meet its needs is * * * relevant under § 221.121, subd. 1, in determining whether the present protesting carrier adequately meets the needs of the area. Conversely, the probable effect of denying the petition and forcing shippers to use transportation deemed inadequate is also relevant.

*American Courier*, 294 Minn. at 213–14, 200 N.W.2d at 180. A rate advantage is also relevant in determining whether a need exists. Showing a need for the proposed service is very similar to showing that the existing carriers do not offer adequate services. Substantial evidence supports the finding that there is a need for the IRCC service proposed by RAC.

■ Brinks also argues that granting RAC IRCC authority was improper because Brinks had demonstrated that existing carriers provide adequate service. The burden is on the protesting carriers to demonstrate that existing carriers offer services which fully and adequately meet the shippers' needs. Minn.Stat. § 221.121, subd. 1. The Commission found the protestants did not meet this burden. It concluded that the award of the Reserve Board contract to RAC indicates inadequate competition. In addition, RAC testified that its purpose in seeking IRCC authority is to provide more efficient service to the Reserve Board. As stated above, *American Courier* provides that a rate advantage offered by the petitioner is relevant in determining whether the present carriers adequately meet the needs of the shippers in the area. *American Courier*, 294 Minn. at 213–14, 200 N.W.2d at 180.

■ The Commission's decision is consistent with the purpose of § 221.121, subd. 1 which is to protect new, underfinanced permit applicants, not insulate existing carriers from further competition. *Signal Delivery* 288 N.W.2d at 712. The Commission's decision in this case reflects "the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process." *American Courier*, 294 Minn. at 214, 200 N.W.2d at 180 *quoting Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 209, 67 S.Ct. 1575, 1583, 91 L.Ed. 1995 (1947). Judicial deference should be accorded the Commission's decisions. *See Quinn Distributing* 288 Minn. at 449, 181 N.W.2d at 700. The Commission's decision here is supported by substantial evidence.

3. *The Commission's Rejection of the Hearing Examiner's Findings*

■ Brinks maintains the Commission rejected the findings of the hearing exam-

iner without properly considering his opportunity to weigh the demeanor and credibility of the witnesses. An agency's decision is arbitrary and capricious when it represents the agency's will and not its judgment, or when it is not supported by the evidence. *Bryan v. Community State Bank of Bloomington*, 285 Minn. 226, 234, 172 N.W.2d 771, 776 (1969).

Our courts have "consistently stressed the importance of agencies employing their expertise to reach independent decisions and not to simply 'rubber stamp' the findings of a hearing examiner." *City of Moorhead v. Minnesota Public Utilities Commission*, 343 N.W.2d 843, 846 (Minn. 1984). In *Hymanson v. City of St. Paul*, 329 N.W.2d 324 (Minn.1983), the supreme court stated:

> [Hearing examiners'] functions are subordinate to a reviewing agency's * * * power. A hearing examiner presides at meetings and makes recommendations for decision. But the agency is not bound by the findings and recommendations of the hearing examiner. K. Davis, *Administrative Law Text*, § 10.07 (3rd ed. 1972). In this sense, the relationship differs from that of an appellate court reviewing a lower court's findings of fact: an agency could make new findings and decide contrary to the hearing examiner's recommendation. *Id.* at § 10.04. A hearing examiner takes no power away from an agency.

*City of Moorhead* at 326–27. In a recent decision, however, this court has made it clear that the hearing examiner's findings should not be taken lightly. In *Mary Jo Beaty v. Minnesota Board of Teaching*, 354 N.W.2d 466 (Minn.Ct.App.1984), this court said:

> When an agency rejects or significantly deviates from the hearing examiner's findings, it should explain, on the record, its reasons for doing so. Failure to do so evidences the agency's desire to exercise its will and not its judgment. A hearing examiner's report and recommendations

should not be summarily rejected without reasons.

*Id.* at 472.

Here the Commission significantly deviated from the hearing examiner's findings and rejected his recommendation but explained its reasons for disagreeing with the hearing examiner. It did not act arbitrarily and capriciously.

Appellant raises other issues which we have reviewed but consider to be without merit.

### DECISION

The Public Utilities Commission had jurisdiction to grant RAC's petition for IRCC authority. Its decision to grant such authority is supported by substantial evidence. The Commission gave proper deference to the hearing examiner's findings and recommendation.

Affirmed.