In the Matter of a complaint by INFO TEL COMMUNICATIONS, LLC v. U.S. WEST Communications, Inc., Concerning Resale of Contract Services U.S. West Communications, Inc., Relator,

v.

MINNESOTA PUBLIC UTILITIES COMMISSION, Info Tel Communications, LLC, Respondent.

No. C4–98–1929.

Court of Appeals of Minnesota.

May 4, 1999.

William L. Greene, Greene Espel P.L.L.P., Minneapolis, MN; and Kevin Saville, U.S.

WEST Communications, Inc., Minneapolis, MN (for relator U.S. WEST Communications, Inc.)

Mike Hatch, Minnesota Attorney General, Dan Lipschultz, Assistant Attorney General, St. Paul, MN (for respondent Minnesota Public Utilities Commission)

Michael J. Bradley, Moss & Barnett, Minneapolis, MN (for intervenor-respondent Info Tel Communications)

Considered and decided by AMUNDSON, Presiding Judge, CRIPPEN, Judge, and ANDERSON, Judge.

## OPINION

AMUNDSON, Judge.

Relator U.S. WEST Communications, Inc. seeks review by writ of certiorari of respondent Minnesota Public Utilities Commission's order determining that U.S. WEST's tariff cannot be applied to impose termination charges on contract customers who continue to receive U.S. WEST's services through a competing "reseller" of the same services. U.S. WEST challenges the Commission's interpretation of the tariff, alleging that the tariff provides for the collection of penalties in all situations where its extended-term contract customers discontinue service with U.S. WEST. Info Tel Communications, LLC urges affirmance of that interpretation.

## FACTS

### Background Information

Congress enacted the Telecommunications Act of 1996 ("the Act") to "foster competition in local telephone service." *GTE South Inc. v. Morrison*, 957 F.Supp. 800, 801 (E.D.Va. 1997). The Act requires incumbent local exchange carriers to: (1) allow interconnection with their networks; (2) provide access to network elements on an unbundled basis; and (3) offer their telecommunications services for resale at wholesale rates to subscribers who are not telecommunications carriers. 47 U.S.C.A. § 251(c) (Supp.1998). The Act defines "incumbent local exchange carrier" as a carrier that

(A) on February 8, 1996, provided telephone exchange service in such area; and (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association * * *; or

(ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

*Id.* § 251(h)(1) (Supp.1998). Under the Act, U.S. WEST is an incumbent local exchange carrier.

As an incumbent local exchange carrier, U.S. WEST is required to offer its services for resale at wholesale rates. *Id.* § 251(c)(4)(A) (Supp.1998). The wholesale carrier, in this case U.S. WEST, provides the underlying service through its facilities, while the reseller takes over the marketing, billing, and collection functions of the service. Under the Act, the individual state commissions are responsible for determining

wholesale rates on the basis of retail rates charges to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

*Id.* § 252(d)(3) (Supp.1998). In a separate proceeding, not at issue in this appeal, the Minnesota Public Utilities Commission determined that resale allowed U.S. WEST to avoid 21.5 percent of the costs associated with its retail price. Therefore, resellers are required to pay 78.5 percent of the retail rate for the wholesale purchase of U.S. WEST's services.

### Specific Facts Underlying this Action

U.S. WEST and Info Tel entered into an interconnection agreement, allowing Info Tel to resell U.S. WEST's retail services. As required by the Act, the Commission reviewed and approved the interconnection agreement. These retail services include "contract services." Contract services are provided to business customers that agree to U.S. WEST services for an extended term, typically a three to five year period, and in return receive discounted rates on these services. Customers who do not satisfy the full

term of their extended term contract are required to pay termination liability assessments (TLAs), which are approximately 15–25 percent of the minimum billing level for the remaining term of the contract.

TLAs appear in both U.S. WEST's tariffs and in its individual contracts with its term discount customers. The relevant portion of the tariff at issue provides as follows:

### 2.2.14 TERMINATION OF SERVICE (CONT'D)

\* \* \*

B. Termination Liability/Waiver Policy

Services provided via service agreements may be subject to the Termination Liability/Waiver Policy. This policy applies only to services that specifically reference this Termination Liability Waiver Policy in their respective section of this Tariff.

\* \* \*

2. Complete Disconnect

If the customer chooses to completely discontinue service, at any time during the term of the agreement, a termination charge will apply \* \* \* \*

3. Partial Disconnect

If the customer discontinues a portion of their service, and that causes the customer's monthly billing level to fall below the Minimum Billing Level of the agreement, a termination charge will apply to the portion of the service agreement that is below the Minimum Billing Level.

In their argument before the Commission, Info Tel alleged that this tariff penalty should not apply to U.S. WEST's customers who terminate their accounts with U.S. WEST in order to receive service from Info Tel. Info Tel specifically alleged that U.S. WEST's imposition of these termination charges (1) violated state and federal laws prohibiting unreasonable restrictions on the resale of telecommunications services; and (2) breached Info Tel's resale agreement with U.S. WEST, which authorized the resale of U.S. WEST's contract services.

The Commission agreed with Info Tel, holding that the plain meaning of the tariff and its underlying purpose does not support imposing a penalty upon those customers who breach their extended-term contract with U.S. WEST to receive telecommunications service through resale by Info Tel. The Commission concluded that such a situation did not result in a "complete disconnect" of U.S. WEST services. Upon the denial of its motion for reconsideration, U.S. WEST petitioned for writ of certiorari.

### ISSUE

Did the Minnesota Public Utilities Commission err in concluding that U.S. WEST cannot impose termination penalties upon its customers who elected to receive telecommunications services through a reseller of U.S. WEST services?

### ANALYSIS

■ Judicial review of administrative proceedings is governed by Minn.Stat. § 14.69 (1998), which provides:

[T]he court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

The party seeking review on appeal has the burden of proving that the agency decision meets one or more of the above-listed statutory criteria. *Markwardt v. State Water Resources Bd.*, 254 N.W.2d 371, 374 (Minn. 1977); *Casper v. Itasca County Human Servs.*, 531 N.W.2d 506, 508 (Minn.App.1995).

U.S. WEST is not asserting that the Commission: (1) violated any constitutional provisions; (2) made a determination in excess of its statutory authority or jurisdiction; or (3) utilized any unlawful procedures in making

its determination. Therefore U.S. WEST is required to show that the Commission's decision was either affected by an error in law, unsupported by substantial evidence, or that it was arbitrary or capricious.

■■■ In reviewing agency decisions, "[s]ubstantial judicial deference" must be accorded to the agency's fact-finding processes. *Brinks Inc. v. Minnesota Pub. Utils. Comm'n*, 355 N.W.2d 446, 449 (Minn.App. 1984). Notwithstanding, this court independently reviews an agency's decision on a question of law or statutory interpretation. *In re Dougherty*, 482 N.W.2d 485, 488 (Minn. App.1992), *review denied* (Minn. June 10, 1992); *see also No Power Line, Inc. v. Minnesota Envtl. Quality Council*, 262 N.W.2d 312, 320 (Minn.1977) (reviewing courts are not bound by the agency's decisions on questions of law and need not defer to the agency's expertise); *cf. St. Otto's Home v. Minnesota Dep't of Human Servs.*, 437 N.W.2d 35, 40 (Minn.1989) (allowing considerable deference to agency's interpretation of its own regulations).

The determination of whether the Commission properly interpreted U.S. WEST's tariff raises questions of law which are subject to de novo review. *See Minnegasco v. Minnesota Pub. Utils. Comm'n*, 549 N.W.2d 904, 907 (Minn.1996) (indicating questions of law are subject to de novo review); *see also Penn Cent. Co. v. General Mills, Inc.*, 439 F.2d 1338, 1340 (8th Cir.1971) (stating that where language of tariff used to indicate ordinary meaning of words, with no particular connotation within agency's area of expertise, interpretation of tariff presents a question of law). In reaching the conclusion that the subject tariff does not apply in a resale context, the commission determined that both the plain meaning of the tariff and its underlying purpose required that it be applied only in "cases involving complete disconnection and total loss of revenue."

■■■ Tariffs are interpreted no differently than any other contract. *Penn Cent. Co.*, 439 F.2d at 1340. Contract interpretation is

a question of law, subject to de novo review. *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998). Interpreting a contract necessitates looking at it as a whole, to determine if ambiguity exists. *Id.* A contract is ambiguous where it is reasonably susceptible to more than a single interpretation. *Id.*

■■■ Further, in interpreting a tariff, some well-established rules of construction apply. *Penn Cent. Co.*, 439 F.2d at 1340. These rules of construction dictate that (1) the terms of a tariff must be taken in the sense in which they are used and accepted; (2) where there is ambiguity, the tariff language should be construed strictly against its author; (3) such ambiguity or doubt must be reasonable, not the result of straining the language; (4) rules relating to tariffs should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results; and (5) a strict construction against a tariff's author is not justified where the construction would ignore a permissible and reasonable construction which conforms to the intentions of the framers of the tariff. *Id.* at 1340–41.

■■■ Here, the "plain meaning" of the tariff does not clearly and unambiguously address when termination penalties apply. Because the tariff language is ambiguous, the intent of the parties must be considered in construing the tariff. *Pine Valley Meats, Inc. v. Canal Capital Corp.*, 566 N.W.2d 357, 365 (Minn.App.1997), *review denied* (Minn. Sept. 18, 1997). The Commission seemed to construe the tariff language against its author, U.S. WEST, finding that a "complete disconnect" of service does not result where a customer switches to a competitor who is reselling U.S. WEST's services. We conclude, however, that this is not a reasonable construction of the tariff. A permissible interpretation of the tariff, conforming to U.S. WEST's intentions and purpose in drafting and imposing its tariff on contract customers, could just as reasonably be applied in construing the tariff.[1] In fact, in interpreting

---

1. Indeed, a contract customer to whom the tariff applies may not even realize that the communication services received from the reseller are actually purchased wholesale from U.S. WEST. From the customer's perspective, ending their account with U.S. WEST is tantamount to a

the tariff, the Commission noted that the underlying purpose of the TLAs was "to ensure a continuing revenue stream for cost recovery purposes" in the event that U.S. WEST's extended-term customers breached their contracts.

Although the Commission reasonably concluded that "cost recovery" was the purpose of the TLAs, it failed to determine whether U.S. WEST actually recovered its costs in the resale context. Instead, the Commission assumed that U.S. WEST does not lose its stream of revenue in a resale context because it continues to recover 78.5 percent of the retail revenue when a reseller purchases its services wholesale. Therefore, "[a]s a matter of law wholesale rates are presumed to equal retail rates minus costs incurred solely for retail purposes." The Commission concluded that, at least theoretically, the stream of revenue has not ended, but continues at the same level. By failing to make specific findings regarding U.S. WEST's actual loss of revenue or ability to recover costs, the Commission reached a potentially unfair result.

Indeed, the Commission explicitly noted that there was conflicting testimony and evidence regarding the actual costs incurred and/or avoided when a contract customer leaves U.S. WEST for a reseller. Yet, the Commission determined that it was "unnecessary to decide the merits or the significance of the cost issue" because it had decided that the tariff does not permit termination charges in the resale context. This reasoning begs the question over the correct interpretation of the tariff. The patent language of which does not indicate that customers who discontinue service with U.S. WEST in favor of a reseller are exempt from TLAs.

The determination of the appropriate wholesale discount at which to offer its services to resellers, which necessarily would allow U.S. WEST to avoid sales and marketing costs, does not automatically translate to the actual costs avoided or incurred when its

services are replaced by a reseller midway through the performance of an extended-term contract. Therefore, this decision must be remanded to the Commission to make specific finding with respect to the costs avoided or incurred in the resale context. Because the Commission's order failed to address this essential element in the interpretation of the tariff, we necessarily reverse and remand this matter to the Commission for a determination of that cost issue. *See In re Investigation into Intra–LATA Equal Access & Presubscription,* 532 N.W.2d 583, 589 (Minn.App.1995) (indicating this court's reluctance to address an agency order where issues are not fully determined or are entangled with internal agency proceedings which are far from complete), *review denied* (Minn. Aug. 30, 1995).[2]

## DECISION

 The language of the tariff at issue does not clearly address whether termination charges will apply to customers of U.S. WEST who break their extended-term contract with U.S. WEST and receive telecommunications services from a reseller who purchases U.S. WEST services wholesale. In this manner, the tariff is ambiguous. Thus, in reaching its determination as to whether termination charges may be applied to extended-term contract customers who breach their contract, the Commission must make thorough findings with respect to all relevant factors, including the costs incurred by U.S. WEST when it loses its customer to a reseller.

**Reversed and remanded.**

complete disconnection of services with U.S. WEST.

**2.** In fact, at this time, there is another appeal pending in our court involving an additional Commission order addressing TLAs contained in U.S. WEST extended-term contracts. Clearly, the end of this litigation does not appear to be in sight for either party.