DEPARTMENT OF NATURAL RE-
SOURCES, Commissioner Joseph
N. Alexander, Relator,

v.

TODD COUNTY HEARINGS
UNIT, Respondent.

No. C6–83–2009.

Court of Appeals of Minnesota.

Oct. 16, 1984.

Hubert H. Humphrey, III, Atty. Gen., Andrew J. Tourville, Jr., Sp. Asst. Atty. Gen., St. Paul, for relator.

L. Joseph Genereux, Dorsey & Whitney, Minneapolis, Gerald W. Von Korff, Kurt A. Deter, Rinke, Noonan, Grote & Smoley, Ltd., Sauk Rapids, for respondent.

Heard, considered and decided by LANSING, P.J., and WOZNIAK, and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

The Minnesota Department of Natural Resources [DNR] has petitioned for a writ of certiorari to review decisions of the Todd County Hearings Unit concerning proposed public waters and wetlands designations. The Hearings Unit is a three-member body created by statute to determine those designations proposed by the DNR which are challenged by landowners or counties. Minn.Stat. § 105.391. The Todd County Hearings Unit rejected DNR-proposed designations in a number of cases, including the seven on appeal here.

The DNR challenges the evidentiary support for these decisions, which are reviewed as decisions of an agency in a contested case. Minn.Stat. § 105.391. The DNR also challenges the participation of the Hearings Unit in this review.

## FACTS

The Legislature in 1979 amended the Minnesota Water Management Law, revising the definitions of public waters and wetlands, and refining the process of inventory and designation of such water resources. The public status of water resources, previously defined in terms of "material beneficial public purpose," Minn. Stat. § 105.38(1) (1978) (amended 1979), is now defined in terms of physical characteristics of bodies of water or wetlands. The designation involves a long process of inventory, proposed designation, county review, publication, notice, and public hearing. Minn.Stat. § 105.391, subd. 1 (1980).

The hearings unit which makes the final determination on contested designations is a three-member body composed of appointees of the county board and the DNR, and a board member of the local soil and water conservation district. Minn.Stat. § 105.-391, subd. 1. The Todd County Hearings Unit held hearings on those DNR-proposed designations which had been challenged, in September, 1983. There were 34 challenges. The DNR is appealing seven of the decisions in which the Hearings Unit rejected the proposed designation.

In two of these decisions, Selinsky Lake (77–184) and Stallcop Lake (77–193), meandered lakes proposed for designation as "public waters," were instead designated as "wetlands." The Hearings Unit found that these waters met the criteria for "public waters," which include "[a]ll meandered lakes." Minn.Stat. § 105.37, subd. 14(c) (1980). The published notice, however, stated that preliminarily-designated "public waters" could be considered for alternative designation as wetlands. The sole effect of this change in designation appears to be that as wetlands they are eligible for inclusion in the state water bank program. Minn.Stat. § 105.391, subd. 3 (1980).

The other five sites, for which a wetlands designation was rejected, present factual issues, centering on the acreage of the "wetlands," and their existence, or size, in the natural state. In order to qualify as "wetlands," a site must fit within Types 3, 4 or 5 of Circular 39, and must be 10 or more acres in size in unincorporated areas. Minn.Stat. § 105.37, subd. 15. The DNR concedes that artificially-created water basins are not to be included in the inventory, and that artificial enlargement of natural wetlands should not be included in the acreage measurement.

In each of these cases, the Hearings Unit found that the DNR-proposed wetland, though belonging to an appropriate type, was less than 10 acres in area, or had been artificially created or enlarged.

The acreage of a proposed site is defined not in terms of open water area, but of "ordinary high water level," defined as follows:

"'Ordinary high water level' means the boundary of public waters and wetlands, and shall be an elevation delineating the highest water level which has been maintained for a sufficient period of time to leave evidence upon the landscape, commonly that point where the natural vegetation changes from predom-

inantly aquatic to predominantly terrestrial."

Minn.Stat. § 105.37, subd. 16 (1980).

The DNR relied on a number of methods and sources in estimating acreage and determining the natural state and size of the proposed wetlands sites.

The 1858 General Land Office (GLO) Survey was used as a historical source to confirm the natural state or the historical acreage of present wetlands sites. All but one of the sites appeared on the GLO plat map; for some of these, a rough measurement was attempted from the surveyor's notes.

The DNR has heavily relied on aerial photos, taken in 1953 and 1963, and measurements taken from these photos by DNR employees using a planimeter. Relying on the scale measurement of the aerial photos, and tracing the boundary between aquatic and upland vegetation as the "ordinary high water level," Minn.Stat. § 105.37, subd. 16, an estimate of acreage was made.

The DNR checked its estimates against a 1968 survey, Bulletin 25, and 1981 Agricultural Stabilization and Conservation Service [ASCS] slides. In some cases, base measurements were made from the ASCS slides. Finally, both flyover and ground inspections were made by DNR staff in 1982 and 1983. There is a dispute as to how extensive these on-site inspections were.

The landowners testified primarily from personal knowledge of the land. Some emphasized historical periods of drought during which the proposed wetlands were used for haying, even raising crops. The landowners also testified to artificial conditions, e.g. dams, roads and ditches, affecting the proposed wetlands sites. Finally, some of the landowners consulted ASCS photos or made estimates of their own based on these photos, and one made his own measurement of the perimeter of the site.

The Hearings Unit conducted its own on-site inspection of two of the proposed wetlands after the hearings.

**ISSUES**

1. Does the Hearings Unit have the right, similar to an agency in a contested case, to participation in appellate review of its decisions?

2. Was the Hearings Unit's designation of meandered lakes fitting the definition of "public waters" as "wetlands" in excess of its statutory authority or otherwise erroneous?

3. Were the decisions of the Hearings Unit on the acreages of the five proposed wetlands supported by substantial evidence?

**ANALYSIS**

*1. Participation of the Hearings Unit in the appeal of its decisions*

■ The Todd County Hearings Unit is an ad hoc adjudicative panel, or "agency," created by the statute to resolve contested public waters or wetlands designations. Minn.Stat. § 105.391, subd. 1. The statute provides that a hearings unit decision

"shall be considered the decision of an agency in a contested case for purposes of judicial review pursuant to sections 14.63 to 14.69."

Minn.Stat. § 105.391, subd. 1 (1980). One of the sections referenced provides as follows:

"The agency and all parties to the proceeding before it shall have the right to participate in the proceedings for review."

Minn.Stat. § 14.64 (1982).

The DNR points out that the Hearings Unit does not fit within the Administrative Procedure Act's definition of an "agency." Minn.Stat. § 14.02, subd. 2 (1982). This does not, however, prevent it from being considered as an agency for purposes of judicial review, including the Hearings Unit's participation in it. We are not persuaded by the policy arguments advanced to disregard the plain language of the statute.

### 2. *"Public waters" and "wetlands"*

Minn.Stat. § 105.37 defines separately the "public waters" classification, subd. 14, and the "wetlands" classification, subd. 15. "Wetlands" are defined first with reference to types defined by Circular 39, and then by acreage. "Public waters," however, are defined with reference to other criteria: prior legal classification or designation, subd. 14(a), (b), (d), and (e); public access or ownership, subd. 14(f), (g), (h). The definitional distinction is clear:

> *"For the purpose of statutes other than section*[s] *105.37,* * * * the term 'public waters' shall include 'wetlands' unless the statute expressly states otherwise."

Subd. 14 (1980) (emphasis added).

The Hearings Unit classified Stallcop and Selinsky Lakes as "wetlands" after finding them to be "meandered lakes," and thus within the definition of "public waters." Subd. 14(c). Stallcop Lake was also found to be a "natural environment lake."

The published notice of the hearings stated that waters which were proposed for designation as "public waters," "may sometimes also be considered for designation, in the alternative, as wetlands." DNR representatives at the hearing acquiesced in the alternative designations of the two meandered lakes as "wetlands." Respondents contend that the DNR should be estopped from challenging these designations on appeal.

■ The landowners who petitioned contesting the public waters designations of both Stallcop and Selinsky Lakes appeared at the hearing and testified in favor of "wetlands" designations. Neither relied to his detriment on the published notice, or on the acquiescence of the DNR, which was granted only after this testimony was heard. *Cf., Transamerica Ins. Group v. Paul,* 267 N.W.2d 180 (Minn.1978) (bonding company issued performance bond based on representation of ownership). There is no basis for applying estoppel against the DNR.

"Meandered lakes" are defined as follows:

> "* * * all bodies of water except streams lying within the meander lines shown on plats made by the United States General Land Office."

Minn.Stat. § 105.37, subd. 13 (1980). The meander lines were drawn for the purpose of determining the quantity of land which was to be paid for by purchasers of the government-owned lands. *State v. Adams,* 251 Minn. 521, 89 N.W.2d 661 (1957). The lakes themselves were excluded from the acreage purchased, and the law was settled that "meandered lakes belong to the state in its sovereign capacity in trust for the public." *Petraborg v. Zontelli,* 217 Minn. 536, 552, 15 N.W.2d 174, 183 (1944).

■ The legislative definition of "public waters" as including all meandered lakes must be read in light of this extensive prior law dealing with meandered lakes. We believe the statute unambiguously includes all meandered lakes within the "public waters" classification. Also, the inclusion of some meandered lakes within the "wetlands" classification conflicts with the overall purpose of the statute, which is to narrowly define the criteria for public waters and wetlands classification and thus eliminate the broad discretion granted under the former test of "material beneficial public purpose." Minn.Stat. § 105.38(1) (1978).

■ The designations of meandered lakes, Stallcop and Selinsky Lakes, as "wetlands" exceeded the Hearing Unit's statutory authority, which was limited by the criteria set forth in Minn.Stat. § 105.37, subds. 14 and 15.

### 3. *Wetlands classifications*

The Legislature has abandoned designation of public waters and wetlands based on broad criteria ("material beneficial public purpose") and has adopted narrower, factual criteria. In particular, the issues in this case were confined to the acreage and type of the proposed sites, as well as the question of whether the resource was artificially created or enlarged.

■ But while the Legislature has narrowed the statutory criteria, it has broadened public participation in the selection process. As a result, landowners may challenge proposed designations, but, to do so effectively, must present evidence directed specifically at vegetation types, water depths and acreage.

The DNR argues that the decisions of the TCHU with respect to the acreage of the five proposed wetlands sites was "[u]nsupported by substantial evidence in view of the entire record as submitted," Minn.Stat. § 14.69(e) (1982).

■ "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Urban Council on Mobility v. Minn. Dept. of Natural Res.*, 289 N.W.2d 729, 733 (Minn.1980). The extent of the evidence required may depend on the nature of the factual issue which must be resolved.

■ Wetlands typing and acreage estimation are within the capacity of a landowner familiar with the property, and properly applying the criteria of the statute and Circular 39. The weight of this testimony is for the administrative agency to determine. *Gibson v. Civil Service Bd.*, 285 Minn. 123, 171 N.W.2d 712 (1969). Appellate review, however, extends to whether the evidence supporting the Hearing Unit's decisions was "substantial," considering the record as a whole, including the measurements and other evidence submitted by the DNR. *See,* Minn.Stat. § 14.69(e). Such a review requires an independent examination of the record. *Appeal of Signal Delivery Service, Inc.*, 288 N.W.2d 707 (Minn.1980). Agency decisions enjoy a presumption of correctness. *Crookston Cattle v. Minn. Dept. of Nat. Res.*, 300 N.W.2d 769, 777 (Minn.1980).

a. 77–17W (Unnamed—Grey Eagle Township)

■ The Hearings Unit found this type 5 wetlands to be less than 10 acres, and also found that the area had been created and expanded by the construction of a road. The landowners testified that the site had been artificially created by the road, and was less than 10 acres, although they did not make a precise estimate. They submitted a statement from an early settler saying that she had farmed the area since 1905, that the proposed wetlands site had been hayed until the 1940's, and that there was only "a very small amount of water" on the site until the road was built which now bisects the site.

The 1858 GLO Survey shows a body of water, of similar size and east-west orientation, lying at approximately the present location, on the line between Sections 15 and 16 of Grey Eagle Township, of proposed wetlands 17W. The aerial photo shows a well-defined basin; the DNR Area Hydrologist wrote to the Hearings Unit that there were oak trees on its banks estimated to be 80 years old. In light of the GLO Survey and supporting evidence, the unsworn statement submitted by the landowners was not "substantial evidence" supporting a determination that wetlands 17W was created by construction of the road.

The evidence established that there was a "margin of error" in measuring wetlands from aerial photographs which was attributable to the scale of the photographs and the judgment involved in tracing the wetlands boundaries from which the measurements were made, in particular, the line between aquatic and terrestrial vegetation which formed the "ordinary high water level." Minn.Stat. § 105.37, subd. 16. Due to the well-defined basin of 17W, however, which did not involve a fringe area shading from aquatic to terrestrial vegetation, we are convinced that the DNR's estimate of 11.5 acres sufficiently established that 17W was more than the 10 acres required by the statute. This excludes the 1.9 acres east of the road which the DNR claimed was also part of 17W.

The landowner claimed to have measured the site at less than 10 acres, but did not show the calculations, or their result. The testimony of the landowners, and other evi-

dence, was not that "substantial evidence" required to support the Hearings Unit's determination.

#### b. 77–65W (Unnamed—Turtle Creek Township)

■ The Hearings Unit found that this site was less than 10 acres, and also found that a man-made structure had substantially increased its size. The testimony showed that the dam was built in 1976. The DNR agrees that the dam has expanded the site to its present size of approximately 49 acres. The DNR, however, presented evidence from 1953 and 1963 aerial photos showing that this site was approximately 25 acres during those years. The 1858 GLO Survey showed a "Pond" at the site which the DNR claimed correlates well with the current size of the wetland, excluding the overflow created by the dam.

Since the landowners agreed that there are 9.5 acres of open water, and the Hearings Unit itself had a planimeter measurement made which showed 10 acres of open water, the critical issue was the wetlands type of the surrounding area and its size in the natural state.

The DNR's expert witnesses testified that the area surrounding the open water was a sedge mat, or "floating bog," above a "large zone of open water." The landowners claimed that cranberries, a plant associated with Type 8 bogs, were dominant in areas of 65W. The Hearings Unit made its own on-site inspection of 65W, and, according to the affidavit of two of its members, found vegetation inconsistent with Types 3, 4, or 5 wetlands.

■ It is not the function of an appellate court to resolve such a conflict in the evidence. *City of St. Paul v. Chicago & N.W. Transp. Co.*, 436 F.Supp. 628 (D.Minn.1977). We defer to the determination of the Hearings Unit, which was supported by substantial evidence. *See, Matter of Plum Grove Lake (Lake 3–564), Becker County*, 297 N.W.2d 130 (Minn. 1980).

#### c. 77–125W (Gadzukes Slough)

■ The Hearings Unit found this site to be less than 10 acres. The landowner personally estimated its size at 9 acres, including a "thumb" area connected to the main site which arguably could have been excluded. He submitted in support an ASCS measurement of 9.6 acres. The DNR's aerial photos showed 14.8 acres; however, its more recent evidence, including a 1981 ASCS color slide, indicated 11.5 acres. Gadzukes Slough did not appear on the GLO Survey.

Although 125W was a well-defined basin, the DNR admitted that there was included a fringe of vegetation around the open-water area, in addition to the "thumb" area. This may have been sufficient to make the DNR's estimate materially affected by the "margin of error" attributable to the tracing procedure. The landowner supported his estimate with an ASCS measurement. We believe the Hearings Unit's determination was supported by substantial evidence.

#### d. 77–175W (Shady Grove Marsh)

■ Shady Grove Marsh involved a ditch in disrepair which may have affected the size of the wetlands. The DNR claims that the Hearings Unit speculated on the impact of an improvement or repair of the ditch in arriving at its finding that the site was less than 10 acres. DNR's measurements, including that from a 1981 ASCS slide, consistently showed the wetlands to be around 15 acres. The landowners estimated 8 to 9 acres, but did not support this estimate.

Shady Grove Marsh is a fairly well-defined basin connected to Todd County Ditch No. 3. The DNR witnesses characterized it as a Type 3 wetland, with some areas of open water, but predominantly a "floating bog" or "sedge mat" vegetation. After the hearing, they submitted an estimate that if Ditch No. 3 were restored to its original condition, but not improved, 175W would shrink slightly to 13 acres.

The Hearings Unit found that 175W was less than 10 acres, but made no mention of the effect of the ditch. From our examination of the record as a whole, this determi-

nation was not supported by substantial evidence. The landowners did not support their estimates of the wetland's acreage, either as it was or as it might be affected by the repair of the ditch. In light of the good definition of the basin in aerial photographs, and the margin by which DNR estimates exceeded the 10 acre minimum, these unsupported estimates of the landowners did not constitute substantial evidence.

*e. 77–316W (Unnamed—Little Sauk Township)*

 This was a very irregularly-shaped site bisected by a road. The Hearings Unit found that the site was less than 10 acres, after making an on-site inspection. DNR estimates varied from 10.7 to 11.3 acres. The landowner estimated the site at 8 acres. He consulted ASCS aerial photos in arriving at his estimate, and obtained an estimated measurement of 9.6 acres from the local ASCS office.

The DNR admitted that 316W, containing several "fingers" of aquatic vegetation, was a very difficult area to measure. The DNR's estimates were very close to the 10-acre minimum. Moreover, the landowner supported his personal estimate, again with ASCS measurements. Accordingly, the Hearings Unit's determination that 316W was less than 10 acres was sufficiently supported by the evidence.

### DECISION

1. The Hearings Unit has a right to participate in these proceedings for review of its decisions.

2. The Hearings Unit's designation of meandered lakes Stallcop and Selinsky as wetlands exceeded its statutory authority. All meandered lakes must be designated as public waters.

3. The Hearings Unit's determinations not to designate the following proposed wetlands sites were not supported by substantial evidence, and are reversed:

17W; and
175W.

4. The Hearings Unit's determinations not to designate the following proposed wetlands are affirmed:

65W;
125W; and
316W.

Affirmed in part, and reversed in part.