DEPARTMENT OF NATURAL
RESOURCES, Relator,

v.

MAHNOMEN COUNTY HEARINGS
UNIT, Respondent.

No. C6–86–1988.

Court of Appeals of Minnesota.

June 9, 1987.
Review Denied Aug. 12, 1987.

Hubert H. Humphrey III, Atty. Gen., Andrew J. Tourville, Jr., Sp. Asst. Atty. Gen., St. Paul, for relator.

William J. Keppel, Gregory A. Fontaine, Dorsey & Whitney, Minneapolis, for respondent.

Heard, considered, and decided by WOZNIAK, P.J., and LESLIE and MULALLY,* JJ.

## OPINION

WOZNIAK, Judge.

The Minnesota Department of Natural Resources (DNR) appeals certain decisions of the Mahnomen County Hearings Unit, in which the unit refused to accept the DNR's recommendations regarding the designation of certain water resources as public waters or wetlands. We affirm in part, and reverse and remand in part.

## FACTS

The hearings unit is a three-member body created by statute to determine whether certain water resources statutorily qualify for the designation of public waters or wetlands. The determination involves a long process of inventory, the DNR's proposed designation, county review, publication, notice, and public hearings. Minn. Stat. § 105.391, subd. 1 (1986).[1] The hearings unit is composed of appointees of the county board, the DNR, and a board member of the local soil and water conservation district. *Id.*

In this case, the DNR had preliminarily designated 117 water resources as public waters or wetlands. In some cases, private owners contested the DNR's recommendations. The hearings unit noted that the evidence was one-sided because the DNR was represented by a lawyer and seven witnesses with expertise in areas such as hydrology, biology, and wetland typing. None of the landowners was represented by counsel and none engaged the expert witnesses necessary to present a complete defense. After several nonconsecutive days of hearings and viewings, on October 27, 1986, the hearings unit issued its order.

Of the 117 water resources the hearings unit reviewed, 62 were designated public waters, 36 were designated public wetlands, and 19 were not classified. Of the 19 unclassified waters, the DNR recommended that 8 remain unclassified. The hearings unit disagreed with the DNR's recommendation on only 11 out of the 117 water resources. The hearings unit did not provide lengthy explanations for its decisions, but used the DNR-prepared "findings" form.

The DNR now appeals from 10 of the 11 decisions in which the hearings unit did not accept DNR recommendations. These 10 cases fall into 2 categories: 1) 3 cases in which the DNR recommended that a water resource be designated a public water, but the hearings unit ruled it a wetland; (2) 1 case in which the DNR recommended that a water resource be designated a public water, but the hearings unit ruled it not a public water nor a wetlands; and 3) 6 cases in which the DNR recommended that an area be designated a wetland, and the hearings unit ruled it was not a wetland.

## ISSUES

1. Did the hearings unit err in its interpretation of the terms "definable banks" and "owners"?

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

1. In 1979, the legislature amended the Minnesota Water Management Law, refining the process of inventory and designation of water resources and providing compensation for certain wetlands under the state waterbank program. Prior to the 1979 amendment, water resources were designated public waters or wetlands by application of the "beneficial public purpose" test. Now public waters and wetlands are determined by a review of factual criteria. The factual criteria included analysis of the water's physical characteristics, such as types of plant life, soil type, depth of standing water, and acreage.

2. Did substantial evidence support the conclusions of the hearings unit regarding the four proposed public waters?

3. Did the hearings unit err in determining the designation of the proposed wetlands based on its condition at the time of hearing but subsequent to drainage?

4. Did substantial evidence support the conclusions of the hearings unit regarding the proposed wetlands?

### ANALYSIS

In contested public water and wetland cases:

> Appellate review * * * extends to whether the evidence supporting the Hearing Unit's decisions was "substantial," considering the record as a whole, including the measurements and other evidence submitted by the DNR. Such a review requires an independent examination of the record. Agency decisions enjoy a presumption of correctness.

*Department of Natural Resources v. Todd County Hearings Unit,* 356 N.W.2d 703, 708 (Minn.Ct.App.1984) (citations omitted), *pet. for rev. denied* (Minn. Feb. 6, 1985).

### The Public Waters Recommendations

1. The statute defines a *waterbasin* as an *enclosed natural depression with definable banks* capable of containing water which may be partly filled with waters of the state and which is discernible on aerial photographs.

Minn.Stat. § 105.37, subd. 9 (emphasis added).

■ The parties disagree on the type of topography required to meet the statutory requirement of definable banks. The DNR states a definable bank is any bank in which any gradation occurs, regardless of how shallow, in which vegetation changes from aquatic to terrestrial, and in which aerial photos indicate the banks capable of holding water. The hearings unit's "definable banks" standard requires only a showing of a significant slope in the physical topography which enables a basin to contain water.

Based on the express words of the statute, the hearings unit definition is proper. Under the DNR's definition, every body of water would constitute a water basin; consequently, the DNR's position effectively writes definable banks out of the statute and replaces it with a "changes in vegetation" definition. The DNR's definition is not of definable banks, but rather is the statute's definition of high water mark. *Id.,* subd. 16 (the ordinary high water level is "where the natural vegetation changes from predominantly aquatic to predominantly terrestrial").

Further, some of the water resources recommended by the DNR had largely expanded acreage from year to year. Such expansion is inconsistent with the definition of definable banks; yet, the water resources showed vegetation changes from aquatic to terrestrial.

■ The proper definition of waterbasin is crucial because a water basin is a requirement for a finding that a public water exists. If a waterbody has definable banks, it will be public water under section 105.37, subd. 14(g) unless the "owner" declares the water unnecessary for public ownership. Public waters include:

> All *waterbasins* where the state of Minnesota or the federal government holds title to any of the beds or shores, unless the *owner* declares that the water is not necessary for the purposes of the public ownership.

*Id.,* subd. 14(g) (emphasis added). The hearings unit took the position that the term "owner" referred to private landowners. Thus, the panel allowed private landowners to testify that no public purpose existed. The panel erred in this position; only a public owner could negate the public interest, particularly where public money was spent to acquire these interests, and the public water designation for those bodies of water required total or partial public ownership.

This error in the hearings unit's position is not fatal to its decisions. Regarding all of the recommended public waters on review, the private owners testified that no public purpose existed for designating their

water resources as public waters. The private landowners' statements regarding public purpose are relevant only if there is a finding that the recommended public waters have definable banks constituting waterbasins. A waterbasin is a requirement for a public water. If the unit's finding that no waterbasins existed was correct, the question of whether the private or public owner may declare the nonexistence of public purpose is moot.

2. Sufficiency issues.[2]

■ *Water resource 116* (Christofferson). This is an 800–acre water resource located in Becker and Mahnomen Counties. Between 1953 and 1966, aerial photos showed only a one-tenth acre increase in the wetlands, and also indicated definable banks capable of holding water. From the 1976 photo, however, the DNR claimed an 80–acre increase. The hearings unit questioned how the water resource could have a definable bank with significant instability in the boundaries. The DNR witness stated he could not explain the increase.

Further, the DNR witness admitted that until recently the DNR considered the area as three water basins. Because the 3 basins were "hydrologically" connected, he stated, they should be considered as 1 basin. He stated that the bank did not have the significant slope that could be noted from a view, but has a gradual slope with a gradual gradation of habitats. The hearings unit stated that such a significant expansion, together with the joining of 3 waterbeds, is mutually exclusive to the definable banks standard. We must agree.

■ *545* (Smith). Hearings unit member J.D. Smith is an owner of this water resource. He submitted a written statement that no definable banks existed and that the water is unnecessary for public purposes. Out of fairness, we note that Smith also had an interest in 2 other water resources but voted to accept the DNR's

recommendation on those water resources. He made the decision regarding 545 in good faith; however, to prevent the appearance of any impropriety, we remand this decision regarding 545 for reconsideration by the hearings unit upon the appointment of a substitute examiner to replace Smith for this decision.

*333* (Steinmetz). This water resource has varied in size from 80 acres to 102 acres from 1953 to 1983, based on tracings from slides and a ground level photo. The owner's crop areas had been reduced from 102 acres to 76 acres over the last few years as a result of the spreading water. He indicated that definable banks would have held the water back, precluding such a dramatic increase in the size of the basin.

The owner of the property and a neighbor testified that the basin had a definable bank only in a small area between the boundary of their properties. They also stated the topography is very flat around the entire basin. We agree that substantial evidence indicated that no definable banks existed.

*344* (Kramer). The private owner submitted a statement that no definable banks existed. The hearings unit viewed the area, examined the DNR's on-site photos, and concluded that no definable banks existed. The evidence, including the owner's measurements and the hearings unit's extrapolation of the DNR aerial photos, indicated that the area was less than 10 acres. The hearings unit concluded that 344 was not a public water because it lacked definable banks, and it was not a wetland because it was less than 10 acres in size. We agree.

**The Wetlands Decisions**

■ 3. The hearings unit found that the 6 water resources discussed below were not wetlands, and refused to adopt the DNR's recommendations. This decision was based on the condition of the area at the time of hearing. All areas had been

**2.** In reviewing these recommended public waters decisions, we are mindful that the hearings unit, in denying the DNR's recommendation of public water designation, still found three of the four water resources to be protected wetlands.

Hence, the water resources would receive statutory protection sought by the DNR even though the recommended designation was not confirmed.

ditched, drained, and sometimes plowed and planted; hence, what were once type 3 or 4 wetlands were not wetlands at the time of the hearing.

The DNR argues that the hearings unit failed to designate the 6 areas as wetlands because each had been unlawfully drained and farmed and did not resemble other wetlands. The DNR proposes that the determination of a wetland designation should be based on the former conditions of these wetlands, determined through an examination of the aerial photo history and other evidence.

The hearings unit decided that the DNR's position required a retroactive application of the law and declined to apply it, invoking the rule that courts and administrative agencies resolve disputes based on the record at the time of the dispute. The hearings unit concludes that if the DNR fails to establish that pre–1979 drainage was illegal, the private owners of the property in question have an "existing right" to continue that drainage. *Id.* § 105.38(1) (DNR's regulatory authority "subject to existing rights").

Section 105.391 delineates the procedure by which a waterbody becomes a public water or wetland: After notice and hearing procedure, "the commissioner shall publish a list of the waters determined to be public waters and wetlands." *Id.* § 105.391, subd. 1. This section implies that a basin becomes a public water or protected wetland at the time the hearings unit issues its final order making that classification. Before that time, a private owner may ditch a basin because it has not been classified into the state's system as a public water or wetland. The statute does not expressly state that any ditching prior to an inventory of the waterbody would be illegal.

The DNR also failed to show that any of the waters under evaluation would have qualified as a public water under the 1973 or 1976 definitions. If it had argued that these waters fit the definition of public waters under those statutes, its argument regarding the unlawfulness of drainage would have merit. Absent that evidence, however, it becomes incumbent upon us to review the sufficiency of the evidence based upon the condition of the areas at the time of the hearing.

■ 4. Regarding the sufficiency of evidence claims, the first step is defining wetlands. The DNR does not dispute that, at the time of the hearing, the areas did not qualify as protected wetlands. Wetlands are:

> limited to all types 3, 4 and 5 wetlands, as defined in United States Fish and Wildlife Service Circular No. 39 (1971 edition), not included within the definition of public waters, which are *ten or more acres in size* in unincorporated areas * *.

*Id.* § 105.37, subd. 15 (emphasis added).

*234* (Klinkhammer). This area had a natural environment shoreline classification and was greater than 10 acres in size. The hearings unit found "none" for the wetland type on the DNR's "Findings" form. The evidence shows that the area is not a wetland at the present time because of previous draining. The DNR's testimony shows, however, that if the land were allowed to return to its former condition, it would be a type 3 wetland.

*238* (Kirsch). Similarly, the only issue with regard to 238 is whether prior drainage (drainage after the August 1979 date, but before the date of hearing) insulates it from a protected wetland classification. The parties do not dispute that the area is substantially greater than 10 acres and has a natural environment shoreline classification.

The owners cropped 238's bed during a few dry years in the late 1930's and 1940's. Since draining, the owner has cropped barley and was growing barley at the time of the hearings unit's view. Aerial photos and tracings confirm that, before the draining, the bed was either open water or aquatic vegetation in 1953, 1966, 1974, 1979, 1980, 1981, and 1982.

The hearings unit found that the area is not a protected wetland; its drainage allowed cropping and vegetation not considered protected wetland vegetation.

*330* (McCollum). The hearings unit found that 330 was a type 3 wetland; how-

ever, it also found that it was less than 10 acres in size. Based on the statute's 10–acre requirement, it concluded that 330 should not be designated as a wetland.

First, substantial evidence showed the area was less than the 10 acres required by statute. The owner had lowered the outlet which provided better drainage for the area, and thus the area was less than 10 acres and not as large as early DNR photos indicated. The owner and his brother had measured the area in June 1984 by "chaining" and obtained a measurement of 9.6 or 9.7 acres.

While the DNR disputed the owner's figures, it relied on figures from 1983 and earlier. The owner had drained the area since 1983, which reduced the acreage of the wetland. The owner and the DNR witness compared the area measured and found the owner's measurement had excluded areas which historically were within the wetland boundaries. The owner and the hearings unit had measured the altered wetland, not its former condition.

The hearings unit also measured the area with a planimeter and found the wetland size to be just under 10 acres. The hearings unit concluded that due to drainage the area was less than the 10 acres necessary to constitute a protected wetland.

With regard to proposed wetlands 238 and 330 mentioned above, substantial evidence supports that the wetlands have been rendered, by drainage, an unprotected wetland.

*345* (Danielson). On 345, the hearings unit found that the area was 30 to 40 acres, but would have been less than 10 acres if it had not been inundated by artificial flooding. Wetlands that exceed 10 acres as a result of unnatural factors are not subject to Chapter 105. *Cf. Todd County*, 356 N.W.2d at 705 (hearings unit based its finding of no wetland on the artificial enlargement of natural wetlands which should not have been included in the acreage measurement). A private owner testified that, prior to artificial flooding, the area consisted of 3 basins with less than 10 acres each.

The hearings unit also found that 345 was a type 2 wetland and therefore not a statutorily-protected wetland. The owners testified that plants such as redgrass, wiregrass, and willow predominate in 345. Circular 39 lists those plants as type 2 indicators.

The DNR witness stated the owners had limited success in farming 345 because it was inundated by water. The owner testified the area was not inundated by water as alleged by the DNR, but that the 1983 harvest was difficult for the entire county and the average bushel per acre was comparable to the Mahnomen County average for barley. It produced 55 bushels per acre as compared to the 56–acre average for the county. There was conflicting evidence on whether the area was a type 2 or type 3 wetland as included in the statutory definition. In *Todd County*, this court stated:

> It is not the function of an appellate court to resolve such a conflict in the evidence. We defer to the determination of the Hearing Unit, which was supported by substantial evidence.

*Id.* at 709 (citations omitted).

In this case, substantial evidence supported the proposition that the waterbody could have been 3 waterbodies with less than 10 acres apiece in its natural condition. The DNR admits that artificial drainage from another source onto this area made the area much wetter. Artificial conditions should not be considered in determining status under chapter 105.

*346* (Danielson). The circumstances surrounding 346 are similar to 345 discussed above. The DNR presented several witnesses testifying that the vegetation is Circular 39 type 3 vegetation. The owners explained that 345 had been expanded considerably and made much wetter by unnatural drainage from surrounding areas and by the plugging of the natural drainageway running from 346 to the adjacent Nature Conservancy land. The effect of this expansion was to increase the amount of type 3 vegetation present. The owners testified that, prior to the time that 346 was drained and tilled, type 2 vegetation dominated the area. The owners explain that type 3 vegetation is found throughout be-

cause the area had been tilled and, as a result, the type 3 vegetation on the site had been uprooted and scattered throughout the basin.

Like 345, the DNR witness testified that crops grown on 346 were a failure. The owners state the area produced 55 bushels of barley per acre, comparable with the county average of 56 bushels per acre.

The hearings unit concluded, regarding 345 and 346, that artificial drainage created the wetland, and the wetland was not of the type protected by statute prior to this drainage. We agree.

*458* (Pazdernik). The hearings unit found that 458 was not a protected wetland because it was less than 10 acres in size, based on the landowner's showing that the wetland is 8.6 acres and upon the panel's view which confirmed the landowner's testimony.

The area had been ditched sometime between 1974 and 1976. The owner testified that he cleaned out the ditch in 1981 or 1982. DNR witnesses stated that, based upon aerial photos and planimeter estimates, 458 ranged in size from 15.3 acres in 1953 to 11.2 acres in 1983.

Although conflicting evidence exists, under *Todd County*, the hearings unit is in the best position to judge the acreage. Accordingly, we find that substantial evidence supports the conclusion of the unit. *Id.*

Throughout this appeal, the DNR's position has been that its recommendations constitute substantial evidence and should be adopted, no matter what standard it had applied in arriving at its recommendation. The legislature intentionally attempted to balance the competing interests of the landowners' freedom to control their land with the DNR's duty to preserve protected water resources. This step by the legislature, to restrain the control of the DNR and subject its recommendations to the hearings unit's approval, does not go unrecognized by this court. The deference accorded to the hearings unit's findings in this decision is based on the standard of review and on the legislative attempt to have the hearings unit resolve disputes between those competing interests.

### DECISION

The hearings unit is affirmed in all respects, except as to recommended public water 545. That decision is remanded, with instruction to Mahnomen County to choose a substitute and impartial appointee to replace J.D. Smith in the remanded decision.

Affirmed in part, reversed and remanded in part.